**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No: 14-9001
_____

SEIFULLAH ABDUL-SALAAM,

Appellant

v.

SECRETARY OF PENNSYLVANIA DEPARTMENT OF
CORRECTIONS; SUPERINTENDENT OF THE STATE
CORRECTIONAL INSTITUTION AT GREENE;
SUPERINTENDENT OF THE STATE CORRECTIONAL
INSTITUTION AT ROCKVIEW; THE ATTORNEY
GENERAL OF THE COMMONWEALTH OF
PENNSYLVANIA; THE DISTRICT ATTORNEY OF THE
COUNTY OF CUMBERLAND
_____

On Appeal from the United States District Court for the
Middle District of Pennsylvania
(D.C. No. 4-02-cv-02124)
District Judge:  Hon. John E. Jones, III

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
March 12, 2018

Before:  CHAGARES, GREENAWAY, JR., and SHWARTZ,
Circuit Judges.

(Filed: July 12, 2018)

Michael Wiseman, Esq.
Law Office of Michael Wiseman
P.O. Box 120
Swarthmore, PA 19081

Ayanna Williams, Esq.
David L. Zuckerman, Esq.
Federal Community Defender Office for the Eastern District
of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106

Counsel for Appellant

David J. Freed, Esq.
Jaime M. Keating, Esq.
Charles J. Volkert, Jr., Esq.
Cumberland County Office of District Attorney
1 Courthouse Square
2nd Floor, Suite 202
Carlisle, PA 17013

Counsel for Appellees

_____

OPINION

_____

CHAGARES, <u>Circuit Judge</u>.

     A jury found petitioner Seifullah Abdul-Salaam, Jr. ("Abdul-Salaam") guilty of first-degree murder, robbery, and conspiracy after a six-day trial in March 1995 in the Court of Common Pleas of Cumberland County, Pennsylvania. After a one-day penalty phase hearing in which Abdul-Salaam's counsel presented three mitigation witnesses, the jury sentenced Abdul-Salaam to death. Abdul-Salaam, after exhausting his state remedies, filed the instant petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his sentence based on trial counsel's provision of ineffective assistance of counsel by failing to investigate adequately and to present sufficient mitigation evidence at sentencing. The United States District Court for the Middle District of Pennsylvania denied the petition. As explained more fully below, because trial counsel could not have had a strategic reason not to investigate Abdul-Salaam's background school and juvenile records, to acquire a mental health evaluation, or to interview more family members about his childhood abuse and poverty, counsel's performance was deficient. Further, because there is a reasonable probability that the un-presented evidence would have caused at least one juror to vote for a sentence of life imprisonment instead of the death penalty, Abdul-Salaam has met the prejudice prong of the ineffective assistance of counsel inquiry. Accordingly, we will reverse in part the Order of the District Court and remand to grant a provisional writ of habeas corpus directed to the penalty phase.

3

I.

A.

At the guilt phase of Abdul-Salaam's trial, the Commonwealth presented evidence showing that on the morning of August 19, 1994, Abdul-Salaam, with Scott Anderson, attempted to rob a store in New Cumberland, Pennsylvania. Abdul-Salaam brandished a handgun during the robbery, then bound and assaulted the shop's owner. When Officer Willis Cole of the New Cumberland Police Department responded, Abdul-Salaam managed to escape but Anderson was caught. As Officer Cole prepared to handcuff Anderson, Abdul-Salaam reappeared with his gun drawn, sprinted toward Officer Cole, and fired at him. Officer Cole died of his gunshot wounds. The jury returned a guilty verdict on first-degree murder, robbery, and conspiracy charges.

The penalty phase of the trial lasted one day. The jury was instructed about four statutory aggravating factors that the Commonwealth had to prove beyond a reasonable doubt.[1] The first two factors were established by virtue of the guilt-phase

---

[1] The four aggravating factors were: (1) "that the victim was a peace officer who was killed in the performance of his duty"; (2) that Abdul-Salaam "committed the killing while in the perpetration of a felony"; (3) that "in the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim"; and (4) that Abdul-Salaam had a "significant history of felony convictions involving the use or threat of violence to the person." Appendix ("App.") 238, 244.

testimony, and the Commonwealth presented eight witnesses to establish the last two factors.

The defense presented three witnesses: Abdul-Salaam's mother and two of his sisters. Mahasin ("Dovetta") Abdul-Salaam, Abdul-Salaam's mother, testified that Abdul-Salaam's father, Seifullah Abdul-Salaam, Sr., was "very abusive" to him, but stated multiple times that "most of the abuse was mental," such as by "inhibit[ing the children's] worth and their consideration of themselves." Appendix ("App.") 276–77. Dovetta added that Abdul-Salaam, Sr. would also physically abuse the children and that to discipline Abdul-Salaam, the father — who abused drugs and was homeless at the time of trial — would punch him in the chest "pretty hard" "until he took the breath out of him." App. 283–84, 286. Dovetta added that as a child, Abdul-Salaam saw his father abuse her as well and often tried to protect her.

Dovetta described the trouble that Abdul-Salaam experienced in school. Because he could not pay attention as a result of his "deficit disorder," Abdul-Salaam was placed in a special school. App. 278. In addition, when he was sixteen or seventeen, as a result of a juvenile adjudication, he was placed in an Alternative Rehabilitation Communities ("ARC") program. Dovetta insisted that she and her daughters love Abdul-Salaam and visit him in prison "every chance [they] get." App. 284.

The next witness was Karima Abdul-Salaam, one of Abdul-Salaam's younger sisters. She "vaguely" remembered "spurts" of her father's drug addiction and abuse. App. 295–96. She said that their father verbally degraded all of the children and she recalled her father hitting Abdul-Salaam,

5

including one instance when she saw her father take an aluminum baseball bat into Abdul-Salaam's room and then heard her father hitting him with it. She recalled times as children when they could find no food in their house except for a can of beans.

Safryah Abdul-Salaam, Abdul-Salaam's youngest sister, briefly testified that she loved her brother and wanted to visit him as often as she could. Although she was young at the time, Safryah remembered seeing her father throwing objects at their mother and hearing her father hitting Abdul-Salaam behind closed doors.

At the close of the penalty phase, the trial court instructed the jurors that it was their task to weigh the aggravating factors against the mitigators and that they must issue a sentence of death if they found that the aggravating factors outweighed the mitigating factors. However, each juror was instructed to give "whatever weight you deem reasonable to mitigating factors." App. 333. The court added that a death sentence must be unanimous. The jury found all four charged aggravating factors and one mitigating factor, namely that "[t]he background that includes both physical and mental abuse does have a negative impact on a person's development and therefore his future behavior." App. 342; see also 42 Pa. Cons. Stat. § 9711(e)(8) (the "catchall" mitigating factor in Pennsylvania). The jury unanimously found that the aggravating factors outweighed the mitigating factor and sentenced Abdul-Salaam to death.

B.

6

Abdul-Salaam filed a direct appeal to the Pennsylvania Supreme Court but did not raise an ineffectiveness claim. That court affirmed the conviction and sentence, Commonwealth v. Abdul-Salaam, 678 A.2d 342, 355 (Pa. 1996), and the United States Supreme Court denied certiorari, Abdul-Salaam v. Pennsylvania, 520 U.S. 1157 (1997). Abdul-Salaam then filed a petition under Pennsylvania's Post-Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. §§ 9541–46, in which he raised the ineffective assistance of counsel claim. The PCRA court held six days of hearings, during which Abdul-Salaam presented institutional records, witnesses who testified about Abdul-Salaam's childhood, and mental health experts.

1.

The most substantial corpus of new evidence consisted of Abdul-Salaam's relatives' testimony providing significantly greater detail on Abdul-Salaam's difficult upbringing. At the PCRA hearing, Abdul-Salaam called ten such witnesses, all but two of whom — his sister Karima and half-brother Raymond Harris — had not been contacted by trial counsel prior to sentencing.[2]

Harris, Abdul-Salaam's older half-brother by eight years, recalled his step-father as a "scary" figure from whom "anger . . . just came across." App. 384–85. Harris described in detail the ways in which Abdul-Salaam, Sr. was abusive

---

[2] Harris said that Abdul-Salaam's trial team first contacted him at 7 a.m. on the day of the penalty phase of the trial and asked him to come and testify at approximately 9 a.m. that day, but that he could not get to the trial on such short notice.

toward him, his mother, and Abdul-Salaam. He testified that he and Abdul-Salaam repeatedly witnessed Abdul-Salaam, Sr. physically abusing their mother by punching her in the face or otherwise hitting her. When Harris attempted to intervene, Abdul-Salaam, Sr. punched him in the stomach, knocking him to the floor. Harris asserted that Abdul-Salaam, Sr. physically abused Abdul-Salaam on many occasions, including on several occasions by hitting Abdul-Salaam with a leather strap. He described a pattern in which the father would abuse their mother, Abdul-Salaam would try to protect her, and the father would then punch him until he fell and would continue the assault "until [Abdul-Salaam] just broke down and cried and submit[ted]." App. 389–90. When asked how many times this occurred, Harris said he had "seen it happen pretty often." App. 392. He added that the family was regularly evicted and that there often was no food for the children to eat in the house.

Abey Abdul-Salaam, the petitioner's younger brother, testified that as a child there were times when there was no food in the house and that he would sometimes eat lozenges from the bathroom for sustenance. He remembered one time when he and Abdul-Salaam were playing basketball indoors and their father thought they were being too loud and so beat them both with an aluminum bat. Josephine Hall, Abdul-Salaam's maternal grandmother, testified that when she would see her grandchildren, they were hungry, withdrawn, and afraid of their father. When she visited her daughter's home there was almost no food in the house and she knew that the utilities were frequently turned off because the bills were not paid. Eddie Washington, Jr., Abdul-Salaam's first cousin on his mother's side, recalled one occasion when Abdul-Salaam was seven or eight years old, where he and Abdul-Salaam were sitting in the backseat of a car while Abdul-Salaam, Sr. was driving. The

8

children were talking and Abdul-Salaam, Sr. "snapped" at them "be quiet or I will kill you." App. 521. Although he did not see Abdul-Salaam often, he recounted seeing him with a black eye on one of the numerous occasions when Dovetta brought the children over to Washington's family's house to get away from Abdul-Salaam, Sr. Whenever Abdul-Salaam's family would come over, he added, they were "very hungry" and that "all they wanted to do" was eat. App. 524.

Florita Goodman, Abdul-Salaam, Sr.'s sister, testified vividly about the abuse:

> [O]ne time I saw him take [Dovetta's] money . . . . And she was crying. And she wanted her money back. And he was taunting at her . . . and took the money and just ripped it up into shreds . . . and then threw it at her. And she was like picking up the money off the floor, but she didn't have any clothes on, and then . . . he beat her with a belt.

App. 453. She recalled seeing her brother force Abdul-Salaam to lick envelopes all night.

Dana Goodman, Abdul-Salaam, Sr.'s younger brother, described Abdul-Salaam, Sr. as violent growing up and testified that as an adult his brother once tried to strangle him with an extension cord. Dana also said that when Abdul-Salaam was a child, Abdul-Salaam, Sr. gave all of the family's money to the Nation of Islam, leaving no money for food or rent. He said that when he saw the family together, Abdul-Salaam, Sr. made Abdul-Salaam recite the rules of the Nation of Islam and would strike him if he made a mistake. Dana saw

9

Abdul-Salaam, Sr. "beat up" Abdul-Salaam "between eight and twelve times," including with a stick, baseball bat, and a pipe. App. 721–23, 729. Dana also stated that Abdul-Salaam, Sr. would punch Abdul-Salaam with his fist as punishment. He added that more than once when the Abdul-Salaam was a small child, he saw Abdul-Salaam, Sr. hit Abdul-Salaam until he was lying on the floor and bleeding, but did not intervene out of fear that Abdul-Salaam, Sr. would turn on him. Lawrence Goodman, Abdul-Salaam, Sr.'s other brother, also recounted fearing Abdul-Salaam, Sr. and seeing him smack Abdul-Salaam with a spoon, causing him to develop lumps on his head. He stated that Abdul-Salaam, Sr. forced the children to learn the Koran late at night.

Karima testified that she remembered seeing her father physically abuse her brothers and had seen her father hit Abdul-Salaam more than ten times. As she did at trial, Karima described the incident when she heard her father hit her brothers with a bat. She said that her father used cocaine and marijuana and that her mother took her and her siblings to battered women shelters two or three times. She also said that when she was a child, there were days they did not eat, that they were evicted several times, and that their utilities were often turned off. Karima explained that before the penalty phase of the trial, Abdul-Salaam's trial attorney spent a total of 10 to 15 minutes talking to her.

Abdul-Salaam, Sr. also testified. He admitted to drug addiction, being verbally "very, very rough" with his children, and hitting Abdul-Salaam, but contended that he would only strike him when it "was called for," meaning when Abdul-Salaam did something "really drastic," such as making fun of prayers. App. 629–34, 638. He agreed that he taught Abdul-

Salaam "racial hatred" and that "white people were evil." App. 640. He denied, however, hitting Abdul-Salaam with a baseball bat.

Finally, Abdul-Salaam's trial counsel, Spero Lappas, testified. Lappas testified that his mitigation strategy during the penalty phase of the trial was to present evidence of Abdul-Salaam's difficult upbringing. Lappas stated that he had not identified any mental health issues at trial, although he had arranged to appoint a psychiatrist, Dr. Crutchley, to evaluate Abdul-Salaam. Lappas did not recall conducting any further investigation into Abdul-Salaam's mental health. He noted that his associate, Ann Ariano, was responsible for interviewing family members and that she told him "that there would be evidence of pretty severe child abuse," but he did not recall if he knew pre-trial about Abdul-Salaam's learning disabilities. App. 1301–02. Lappas added that he did not try to obtain Abdul-Salaam's school or juvenile records and that he could not identify a strategic reason for not doing so.

Lappas explained his belief that presenting mental health evidence has a dangerous side to it, but agreed that there was no danger in investigating the matter in the first place and again could not say why he did not do so. He articulated his view that battling mental health experts create "a very bad impression on a jury." App. 1314. He added cryptically that mental health defenses raise a risk of relitigating the crime and allowing the prosecutor "to not just describe the defendant's acts in a factual context, but in almost a moral context." App. 1314. Lappas testified that he refused to have Dr. Crutchley evaluate Abdul-Salaam because he did not want her to explore events relating to the underlying charges and because Dr.

11

Crutchley indicated that it was important to her that there would be expressions of remorse.

Lappas's associate, Ann Ariano, also testified. She recalled interviewing Dovetta, Karima, and Abey in preparing for trial, but not any other family members. She stated that all of the interviews were conducted shortly before the trial, but she could not remember exactly when.

2.

Abdul-Salaam also introduced a large number of school and juvenile records at the PCRA hearings, and these records were reviewed by the experts who testified at the hearings. His school records, which trial counsel had not pursued, showed that Abdul-Salaam attended the Green Tree School in Philadelphia for children with special needs from just prior to his seventh birthday to age twelve. During his enrollment there, Abdul-Salaam underwent multiple psychological and neurological evaluations. At age six, he was found by psychiatrist Katharine Goddard to be hyperactive, undisciplined, and paranoid and given a diagnosis of "Unsocialized Aggressive Reaction of Childhood Secondary to Phobic Reactions." App. 1626–27. Goddard deemed his problems so severe that they could not be accommodated even in a class for emotionally disturbed children and recommended placement in a residential psychotherapeutic facility. Other evaluations recommended placement in a class for emotionally disturbed children on an emergency basis because he was a physical threat in the classroom. One neurological exam noted "some signs of minimal cerebral dysfunction," while another assessment did not reveal such impairment but recommended a full neurological exam to reach a firm conclusion. App.

12

1632–33. The school records also contained evidence suggesting that Abdul-Salaam experienced physical abuse at home.

Abdul-Salaam's juvenile records paint a similar picture of difficulty socializing, repeated adjudications of delinquency, psychological evaluations, brief improvements, and relapses. The Commonwealth used many incidents from his criminal history to establish aggravating factors at sentencing, see App. 249, 254–57, 264–65, but trial counsel failed to obtain the related records. They contained additional psychological evaluations, such as those taken in May 1986, after Abdul-Salaam was released from the Lehigh County Juvenile Detention Home and placed in the Wiley House Diagnostic Center. Those evaluations diagnosed Abdul-Salaam with an Adjustment Reaction with Mixed Disturbance of Emotions and Conduct which expressed itself in terms of conduct (stealing) and in terms of emotions (depression and anger related to his father and inadequate money).

In June 1986, Abdul-Salaam was placed in the Glen Mills School for Boys. Abdul-Salaam initially adjusted poorly. Although his behavior began to improve, Dovetta asked for his release because she needed his help supporting the family. With the support of his probation officer, who was under the belief that Abdul-Salaam, Sr. had permanently left the home, Abdul-Salaam was released in September 1986. He was enrolled in his high school's Socially-Emotionally Disturbed class but was quickly suspended for fighting.

Abdul-Salaam found his way back into trouble. In a report for the court, a juvenile probation officer noted Abdul-Salaam's history of "defiant and manipulative" behavior and

13

his "propensity to use violence as his major defense." App. 2095. The officer noted his unstable home environment and his conflict with his father due to his strict discipline and "conversion of the family to the Black Muslim religion." App. 2095. Abdul-Salaam was placed in the ARC Secure Facility in February 1987, when he was 16 years old. His progress was initially slow, but his behavior and attitude improved and he was discharged in April 1988.

3.

Abdul-Salaam and the Commonwealth presented medical experts at the PCRA hearing, who opined on Abdul-Salaam's mental health based on his records and their observations. Abdul-Salaam presented the testimony of Drs. Patricia Fleming, Julie Kessel, Carol Armstrong, and Carolyn Crutchley. The Commonwealth presented Holly Evans Schaffer and Drs. Paul Delfin and Larry Rotenberg.

Dr. Fleming, a clinical psychologist who evaluated Abdul-Salaam, noted that his record and IQ scores were red flags warranting further neurological evaluation and that his academic deficits, including a third-grade reading level in the tenth grade, were significant. She opined that his records showed the dynamics of an abused child. Fleming believed that Abdul-Salaam was under the influence of extreme mental or emotional disturbance and had an impaired ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law at the time of the offense.

Dr. Kessel, a psychiatrist, evaluated Abdul-Salaam and reviewed his records. Kessel concluded that Abdul-Salaam

14

had attention deficit hyperactivity disorder ("ADHD"), a cognitive disorder suggesting an organic impairment, and schizotypal features to his character. Kessel disagreed with Dr. Rotenberg's view that Abdul-Salaam was not brain damaged. She explained that his behavior was grossly abhorrent from a young age and he was diagnosed with minimal cerebral dysfunction (now known as ADHD). Kessel found "substantial evidence" that Abdul-Salaam had been "victimized as a young person, preadolescent, and in his early youth" by his father's emotional and physical abuse. App. 1070. Kessel explained that a primary caregiver's abuse impairs a person's ability to make judgments as an adult and that as a person "with organic brain damage," Abdul-Salaam would likely be less able to come to a socially appropriate resolution of the anger and aggression engendered by his father. App. 1088–90. Like Fleming, Kessel opined that in 1994 Abdul-Salaam suffered from an extreme mental or emotional disturbance and that his capacity to appreciate the criminality of his conduct and conform his conduct to the law was "[a]bsolutely" impaired. App. 1093–94. She believed that Abdul-Salaam had "substantial organic dysfunction" and that Dr. Rotenberg's contrary diagnosis did not adequately explain Abdul-Salaam's symptoms. App. 1094–95.

Dr. Armstrong, a neuropsychologist, tested Abdul-Salaam and found severe impairments in his logical reasoning and cognitive flexibility. She stated that the severity of Abdul-Salam's abuse was moderate, partly because it was "repetitive and chronic," and described the damaging effects that such abuse can have on a child's brain development. App. 1216–20. She concluded that Abdul-Salam had "some sort of brain damage that's preventing his frontal lobes from functioning well." App. 1177.

Dr. Crutchley, the psychiatrist whom Lappas almost retained to evaluate Abdul-Salaam, also testified. Crutchley said she had asked Lappas to obtain Abdul-Salaam's school and juvenile records, but that she did not receive them. She opined that Dr. Armstrong's report "document[s] neuropsychological impairment," which would interfere with Abdul-Salaam's ability to control his behavior and noted that the disparity between Abdul-Salaam's verbal and performance IQ raises questions concerning whether he had brain damage and called for further testing. App. 1031–32.

In rebuttal, the Commonwealth presented Schaffer's testimony that she administered two personality tests to Abdul-Salaam, with Dr. Rotenberg present. Dr. Delphin interpreted the tests (but did not assess Abdul-Salaam) as well as the conclusions of Drs. Fleming and Armstrong, and determined that based on their reports, Abdul-Salaam's neuropsychological test results were within normal limits and that there was "[n]o evidence of neuropsychological problems." App. 1378–80, 1383–84, 1389. Delphin challenged the results of Dr. Fleming's personality tests and explained that despite Abdul-Salaam's antisocial and sadistic personality, he was not at the time of the murder under the influence of an extreme mental or emotional disturbance or impaired in his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. He found no evidence of organic brain damage or a schizotypal disorder.

Dr. Rotenberg evaluated Abdul-Salaam and reviewed his school records, and opined that impulsive behavior and ADHD does not mean a person cannot conform their acts to the law. He said that based on Abdul-Salaam's experts'

16

conclusions, one would have expected that he would have been hospitalized or treated with medication.[3]  Turning to Abdul-Salaam's juvenile record, he noted evidence of Abdul-Salaam's violent and manipulative behavior noted at the Wiley House, explaining that Abdul-Salaam's description as being a strong leader and ridiculing others showed "sophisticated form[s] of interaction," which implied that Abdul-Salaam had the intellectual ability to perceive right from wrong.  App. 1468–71.  Rotenberg found the extent and nature of the abuse less clear than as described by others.  He diagnosed Abdul-Salaam with a personality disorder, not otherwise specified, with antisocial, obsessive-compulsive and narcissistic features.  Based on his evaluation, Abdul-Salaam's records, and "all the testimony" and affidavits, Rotenberg determined that Abdul-Salaam did not have organic brain damage or a schizotypal personality, that he was not under the influence of an extreme mental or emotional disturbance at the time of the crime, and that his ability to conform his conduct to the requirements of the law was not substantially impaired.  App. 1494–96.

## C.

The PCRA court denied Abdul-Salaam post-conviction relief.  In its ruling on Abdul-Salaam's ineffective assistance claim, the PCRA court determined that trial counsel did not render deficient representation in failing to investigate or present the above-noted mitigating evidence because he did so

---

[3] Abdul-Salaam argues reasonably that Rotenberg's assessment here misconstrues the record, which includes numerous indications that Abdul-Salaam was, in fact, recommended for such interventions.  See Reply Br. 12–13; App. 1627.

17

for a reasonable strategic purpose.[4]  Based on Lappas's testimony that mental health testimony resulted in a battle of experts that was unappealing to the jury and risked relitigating the crime, as well as his reason for not retaining Dr. Crutchley, the PCRA court reasoned that "a detailed revelation of the defendant's past, necessary to mount any sort of mental health defense, posed the very real risk of doing more harm than good."  App. 1580.  The PCRA court also noted that it found the assertion that Abdul-Salaam suffered from "organic brain damage or any other mental illness" to be "deeply flawed" and "completely unpersuasive."  App. 1581, 1583.  The PCRA court made no findings regarding prejudice.

The Pennsylvania Supreme Court affirmed.  Like the PCRA court, the Pennsylvania Supreme Court reached its decision primarily on the basis that Lappas's performance was not deficient because, based on the concerns he stated at the PCRA hearing, he "had a reasonable basis for not presenting the mitigating evidence [Abdul-Salaam] now claims counsel should have offered."  Commonwealth v. Abdul-Salaam, 808 A.2d 558, 562 (Pa. 2001).  Although not expressly reaching the issue of prejudice, in a footnote, the Court noted that Abdul-Salaam's claim "that trial counsel was ineffective for failing to present evidence of the abuse he suffered as a child . . . is specious in light of the fact that . . . counsel presented the testimony of several family members who described

---

[4] In Strickland v. Washington, 466 U.S. 668 (1984), the United States Supreme Court provided the standard for judging ineffective assistance of counsel claims.  To succeed, a petitioner must show (1) "that [his] counsel's performance was deficient;" and (2) "that the deficient performance prejudiced the defense."  Id. at 687.

18

Appellant's abusive upbringing" and that calling additional family members would "have merely been cumulative." Id. at 562 n.5. In another footnote, the Court agreed with the PCRA court that the mental health evidence did not show that Abdul-Salaam suffered from "organic brain damage or any other mental illness." Id. at 561 n.4.

D.

Abdul-Salaam filed a petition in federal district court seeking a writ of habeas corpus. As relevant on appeal, Abdul-Salaam claimed that trial counsel was constitutionally ineffective during the penalty phase of his trial for failing to investigate and present testimony of (1) family members regarding his dysfunctional and violent childhood, (2) records relating to his schooling, prior criminal history, and childhood mental health evaluations, and (3) a mental health expert. The District Court denied relief. Reviewing the Pennsylvania Supreme Court's determination that trial counsel had a reasonable basis not to present mitigation evidence under the deferential standard of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), it found "no reasonable argument to sustain" this conclusion, because Lappas could not have — and admitted that he did not have — any basis not to investigate the institutional records from Abdul-Salaam's childhood. App. 151–53. However, assessing Strickland's prejudice prong — which it reviewed de novo given the absence of treatment at the state court level — the District Court concluded that Abdul-Salaam was not prejudiced by his counsel's deficient performance. The District Court reasoned that because the jury heard testimony about Abdul-Salaam's childhood abuse, learning disorders, and behavioral problems, and in fact applied the "catchall"

19

mitigating factor in response to that evidence, it was not reasonably probable that further evidence about Abdul-Salaam's childhood abuse and mental health would have changed the outcome of his sentencing.

Abdul-Salaam timely filed a notice of appeal, and this Court granted a Certificate of Appealability with respect to a single claim: whether "trial counsel rendered ineffective assistance during the penalty phase by failing to investigate and present mitigating evidence." App. 189. We now conclude that he did.

## II.

The District Court had jurisdiction under 28 U.S.C. §§ 2241 and 2254. This Court has appellate jurisdiction under 28 U.S.C. §§ 1291 and 2253. Johnson v. Folino, 705 F.3d 117, 127 (3d Cir. 2013). Because the District Court did not hold an evidentiary hearing, our review of the District Court's opinion and order is plenary. Robinson v. Beard, 762 F.3d 316, 323 (3d Cir. 2014). However, to the extent the Commonwealth courts ruled on the merits of Abdul-Salaam's ineffectiveness claim, we must apply AEDPA deference to the "last reasoned decision" of the Commonwealth courts on that claim. Bond v. Beard, 539 F.3d 256, 289–90 (3d Cir. 2008).

## A.

AEDPA "limits the power of a federal court to grant habeas relief to a person in custody pursuant to a state court judgment" to when the person's custody is "in violation of the Constitution or laws or treaties of the United States." Han Tak Lee v. Glunt, 667 F.3d 397, 402 (3d Cir. 2012) (quoting 28

20

U.S.C. § 2254(a)). Where the Commonwealth court adjudicated the merits of a federal claim, a district court may grant habeas relief on that claim only if the Commonwealth court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). If, however, the Commonwealth court did not address the merits of a federal claim, "'the deferential standards provided by AEDPA . . . do not apply,' and we 'must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA.'" Johnson, 705 F.3d at 127 (first quoting Taylor v. Horn, 504 F.3d 416, 429 (3d Cir. 2007); then quoting Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001)). A state court decision is "an unreasonable application" of Supreme Court case law only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams v. Taylor, 529 U.S. 362, 413 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

Both of the Commonwealth courts here denied Abdul-Salaam's ineffectiveness claim on the basis of the deficient performance prong and did not expressly reach the prejudice analysis. See Abdul-Salaam, 808 A.2d at 562. The Pennsylvania Supreme Court accordingly wrote the last reasoned decision on the deficiency prong, so our deference

21

will focus on its analysis. <u>Bond</u>, 539 F.3d at 289. Although it was not the basis of its decision, the Pennsylvania Supreme Court determined that Abdul-Salaam's claim concerning counsel's failure to investigate additional family members or present more evidence of his childhood abuse was "specious" and that calling additional family members would "have merely been cumulative." <u>Abdul-Salaam</u>, 808 A.2d at 562 n.5. Such a factual determination must be reviewed under the deferential § 2254(d)(2) framework. <u>See</u> <u>Lambert v. Blackwell</u>, 387 F.3d 210, 235–36 & n.19 (3d Cir. 2004); <u>Jermyn v. Horn</u>, 266 F.3d 257, 286 (3d Cir. 2001); <u>see also</u> <u>Vega v. Ryan</u>, 757 F.3d 960, 974 (9th Cir. 2014) (reviewing, under § 2254(d)(2), a "state court's findings that [a witness's] testimony would have been cumulative and would have had no effect on the verdict"); <u>Mays v. Stephens</u>, 757 F.3d 211, 216 (5th Cir. 2014) (same); <u>Cooper v. Sec'y, Dep't of Corr.</u>, 646 F.3d 1328, 1353 (11th Cir. 2011) (same); <u>Hall v. Washington</u>, 106 F.3d 742, 752 (7th Cir. 1997).[5] In addition, the Pennsylvania Supreme Court's agreement that the mental

---

[5] To the extent that this statement could be read as a merits determination that the omission of the additional family evidence did not prejudice Abdul-Salaam because it was merely cumulative, <u>see</u> <u>Lewis v. Horn</u>, 581 F.3d 92, 116 (3d Cir. 2009) (requiring the application of § 2254(d) deference where the state court's "decision can be interpreted as concluding that [petitioner] was not prejudiced . . . just as easily as it can be interpreted as concluding that his counsel's conduct was not unreasonable"), such a conclusion regarding the prejudice of a subset of evidence without considering the totality of the evidence is an unreasonable application of Supreme Court precedent and does not merit AEDPA deference, <u>see</u> <u>Williams</u>, 529 U.S. at 397–98.

health evidence did not show that Abdul-Salaam suffered from "organic brain damage or any other mental illness," Abdul-Salaam, 808 A.2d at 562 n.4, is a factual determination that binds this Court unless we conclude it was objectively unreasonable or unsupported by clear and convincing evidence, § 2254(d)(2), (e)(1). These factual findings aside, because the Pennsylvania courts did not address the prejudice prong of the ineffectiveness inquiry, we review that legal question de novo. See Porter v. McCollum, 558 U.S. 30, 39 (2009) (applying AEDPA deference to state courts' determination of the prejudice prong but de novo review to the deficiency prong, which the state court did not reach); Rompilla v. Beard, 545 U.S. 374, 390 (2005) (applying de novo review to prejudice prong because state court reached only deficiency prong).[6]

---

[6] The Commonwealth argues based on Richter, 562 U.S. at 98, that we should apply AEDPA deference to the Pennsylvania courts' denial of the entire Strickland claim, covering both prongs, regardless of which prong those courts relied upon. However, in Dennis v. Sec'y, Pa. Dep't of Corr., 834 F.3d 263, 283–84 (3d Cir. 2016) (en banc), this Court clarified that Richter applies only where a state court was silent as to which prong of a multi-part test it based its decision upon. Where, as here, the state court specifies that it based its ruling on one prong of a test, we do not apply deference to hypothetical theories that could support a decision based on the other prong, which the state court explicitly did not reach. See id. In its Sur Reply brief, filed after the publication of Dennis, the Commonwealth seems to concede that Dennis clarifies that Richter does not apply to this case. See Sur Reply Br. 4–5. Instead, the Commonwealth argues that the internal logic of Strickland mandates that a decision that counsel was not

23

deficient has embedded within it the conclusion that there was no prejudice, such that the determination of the former is also a determination of the latter. Commw. Br. 40–41; Sur Reply Br. 2. However, the Supreme Court in Rompilla clearly rejected that this logic underlies Strickland, because it considered de novo the prejudice prong despite the state court's merits review of the deficiency prong. 545 U.S. at 390. Whatever effect the Commonwealth asserts Richter had on the application of AEDPA review to the Strickland prongs, it had no impact on the underlying logic of the prongs themselves, which Rompilla clearly understood as operating independently. See also Sears v. Upton, 561 U.S. 945, 954 n.10 (2010) ("The one inquiry, deficient mitigation investigation, is distinct from the second, whether there was prejudice as a result.")

Indeed, the Commonwealth misunderstands the analysis underpinning the deficiency prong. A reviewing court will not second guess a counsel's contemporaneous reasonable and bona fide strategic decision, even though "in the harsh light of hindsight" it might be abundantly clear that the strategy was not only faulty, but damaging. Bell v. Cone, 535 U.S. 685, 702 (2002); Richter, 562 U.S. at 110 ("[A]n attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities."). Prejudice, on the other hand, is analyzed taking into account everything that the reviewing court knows given the benefits of hindsight, whether or not it was reasonably ignored by trial counsel. See, e.g., Lockhart v. Fretwell, 506 U.S. 364, 372 (1993) (holding that the concerns underlying "the rule of contemporary assessment" do not apply to the prejudice prong); Meyers v. Gillis, 142 F.3d 664, 668 (3d Cir. 1998) (explaining that the prejudice inquiry requires a

B.

We have little difficulty concluding that the District Court correctly found that trial counsel's representation was deficient and that the Pennsylvania Supreme Court's decision to the contrary was an unreasonable application of clearly established law.

The Pennsylvania Supreme Court determined that Lappas did not perform deficiently in failing to obtain mental health experts because Lappas's testimony about the dangers of presenting expert testimony during a capital sentencing trial provided a reasonable strategic basis for his decision not to pursue such experts. Abdul-Salaam, 808 A.2d at 562. Additionally, the Pennsylvania Supreme Court appeared to conclude that Lappas was not deficient for failing to investigate and call additional family witnesses to testify because such testimony would have been cumulative of the testimony presented at trial. Id. at 562 n.5. Both of these conclusions

---

"court to determine in hindsight" whether counsel's deficient performance affected the outcome). It is entirely consistent with Strickland to find that counsel's representation was not at the time deficient but to recognize that, had counsel pursued a different (and in hindsight clearly better) approach, there is a "reasonable probability" that "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In this way, counsel's performance can, as a matter of logic, be not deficient but nonetheless have prejudiced his client. Of course, because Strickland requires both deficiency and prejudice, such a circumstance would nevertheless fail to constitute a Sixth Amendment violation.

25

involved an objectively unreasonable application of the deficient performance prong of the Strickland test.

Although "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," an unreasonably limited investigation informing those strategic choices can amount to deficient performance. Strickland, 466 U.S. at 690–91. That is because "if counsel has failed to conduct a reasonable investigation to prepare for sentencing, then he cannot possibly be said to have made a reasonable decision as to what to present at sentencing." Blystone v. Horn, 664 F.3d 397, 420 (3d Cir. 2011). Counsel can make a strategic decision to halt an avenue of investigation if he has completed a foundation of investigation to reach that decision, but decisions not to investigate certain types of evidence cannot be called "strategic" when counsel "fail[s] to seek rudimentary background information." Bond, 539 F.3d at 289. This Court has highlighted that counsel often will need to obtain school, medical and other institutional records, which are "readily available," to glean the background information necessary to direct the rest of an investigation. Id. at 288; Blystone, 664 F.3d at 420. A failure to investigate background records can amount to deficient performance even where "not all of the additional evidence" in those records is favorable to the defendant, Williams, 529 U.S. at 396; Sears v. Upton, 561 U.S. 945, 951 (2010), or where counsel had presented evidence that articulated the gist of the un-investigated evidence, Sears, 561 U.S. at 954.

Because Lappas failed sufficiently to pursue expert testimony about Abdul-Salaam's mental health, his proffered explanation that such testimony might result in warring experts

26

or a relitigation of the trial was unreasonable, given that he had no basis to presume that the content of the unpursued expert reports would even provide fodder for disagreement. See Wood v. Allen, 558 U.S. 290, 307 (2010) (Stevens, J., dissenting) ("A decision cannot be fairly characterized as 'strategic' unless it is a conscious choice between two legitimate and rational alternatives."). But even if this decision could be considered strategic, Lappas's asserted basis for not introducing such experts could not justify his failure to even obtain their views or to obtain Abdul-Salaam's background educational and juvenile records for his own review. Such information provides the kind of "rudimentary background information" that there can be no strategic reason not to investigate, whether or not the records are ultimately introduced at trial. Bond, 539 F.3d at 289; Tennard v. Dretke, 542 U.S. 274, 287 (2004) ("[I]mpaired intellectual functioning is inherently mitigating."). The reasonableness of counsel's performance is determined based on the "prevailing professional norms" at the time of the representation, Bond, 539 F.3d at 288, and "[i]t is unquestioned that under the prevailing professional norms at the time of [the] trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background,'" Porter, 558 U.S. at 39 (quoting Williams, 529 U.S. at 396)). Lappas plainly failed to do so and, regarding the school and juvenile records, admitted that this oversight had no strategic basis.

The Pennsylvania Supreme Court's conclusion that Lappas did not perform deficiently in failing to investigate and present more than three family witnesses about Abdul-Salaam's abusive upbringing was also unreasonable. In the assessment of the deficiency prong in this case, the issue is not whether counsel should have introduced more family witnesses

27

in mitigation, but instead "whether the investigation . . . was itself reasonable." Wiggins v. Smith, 539 U.S. 510, 523 (2003). The ABA Guidelines applicable at the time of Abdul-Salaam's 1995 trial — which courts consider to "assess counsel's performance," Saranchak v. Sec'y, Pa. Dep't of Corr., 802 F.3d 579, 595 (3d Cir. 2015) — provided that in preparing for a capital sentencing trial, defense counsel should try to "discover all reasonably available mitigating evidence," regardless of whether all of that evidence will ultimately be introduced at trial. ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C) (1989). Lappas could not have had a strategic reason to limit his investigation to interviewing only three family witnesses, instead of interviewing more family members and then deciding which of them would present the strongest mitigation testimony at trial. Based on Lappas's and Ariano's PCRA testimony, it seems that counsel contacted so few of Abdul-Salaam's family members due to a lack of preparation and not for any strategic reason. Counsel's representation was deficient.

## C.

Abdul-Salaam may establish prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. Because the Commonwealth courts did not reach the prejudice prong of the analysis, our review is de novo.

28

The issue here is whether, but for trial counsel's failure to adequately investigate mitigating evidence, there is a reasonable probability that the jury would have imposed life imprisonment instead of the death sentence. Because a Pennsylvania death sentence must be unanimous, a defendant can show prejudice "if there is a reasonable probability that the presentation of the specific and disturbing evidence of childhood abuse and neglect as a mitigating factor would have convinced one juror to find the mitigating factor[] to outweigh" the aggravating factors. Jermyn, 266 F.3d at 309. Prejudice may exist even if the defendant could not have established additional mitigating factors if he can show that but for counsel's errors he could have "presented evidence of an entirely different weight and quality" going to the same mitigating factor established at trial. Id. at 310. In other words, prejudice may exist where but for counsel's errors, evidence could have been introduced "that was upgraded dramatically in quality and quantity," Bond, 539 F.3d at 291, even where that evidence supports the same mitigating factor pursued at trial, see Saranchak, 802 F.3d at 600.

To determine whether there is a reasonable probability that the uninvestigated mitigation evidence would have changed one juror's mind, we must "evaluate the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding" and re-weigh that evidence against the evidence that the Commonwealth produced in aggravation. Williams, 529 U.S. at 397–98. Although we perform this legal analysis de novo, we must afford AEDPA deference to factual findings by the Commonwealth courts regarding the weight of that evidence, so long as they are not unreasonable in light of the record. See Blackwell, 387 F.3d at 235–36 & n.19; Lambert v. Blodgett,

393 F.3d 943, 977–78 (9th Cir. 2004) ("[A] federal court reviewing a state court conclusion . . . must first separate the legal conclusions from the factual determinations that underlie it. Fact-finding underlying the state court's decision is accorded the full deference of §[] 2254(d)(2) . . . ."). We therefore defer to the Pennsylvania Supreme Court's fact-finding that Abdul-Salaam did not suffer at the time of the crime from organic brain damage or any other mental illness warranting the application of either of the two mental health mitigators Abdul-Salaam pursues.[7] As explained more fully below, however, because we conclude that the un-presented

---

[7] Such deference to the factual determination that Abdul-Salaam does not suffer from organic brain damage does not, however, require us to discount Abdul-Salaam's mental health testimony entirely. Although the Pennsylvania courts found unpersuasive the assertion that Abdul-Salaam suffered from organic brain damage, they made no findings concerning other aspects of the mental health evidence, which include substantial findings that — although perhaps insufficient to independently establish additional mitigators — suggest a variety of mental illnesses and abuse-related disorders that bolster Abdul-Salaam's mitigation defense. See Bond, 539 F.3d at 290–91 (refusing to defer to state court's determination that defendant's un-presented mental health testimony was entirely refuted and could not support a finding of prejudice, where the Commonwealth's expert failed to discuss all the findings); see also Porter, 558 U.S. at 42–43 (holding that where, as here, a jury may consider as mitigating "mental health evidence that does not rise to the level of establishing a statutory mitigat[or]," "it was not reasonable to discount entirely the effect that [rebutted expert] testimony might have had on the jury").

family member testimony "was of a totally different quality" than the "meager evidence" that had been "presented on that issue" at trial, Jermyn, 266 F.3d at 286, we will not defer to the Pennsylvania Supreme Court's apparent factual conclusion that additional family member testimony would have been cumulative, see Abdul-Salaam, 808 A.2d at 562 n.5. For this same reason — the vastly upgraded quality of the un-presented evidence — we conclude that the District Court erred in ruling that because trial counsel presented general evidence of Abdul-Salaam's troubled background, Abdul-Salaam was not prejudiced by the failure to investigate or present the additional evidence established at the PCRA hearing. See Sears, 561 U.S. at 954 ("We have never limited the prejudice inquiry under Strickland to cases in which there was only 'little or no mitigation evidence' presented. . . . [W]e also have found deficiency and prejudice in other cases in which counsel presented what could be described as a superficially reasonable mitigation theory during the penalty phase." (citation omitted)).

Abdul-Salaam's trial counsel presented three witnesses to support the mitigation case — covering just 28 pages of trial transcript — which generally showed that Abdul-Salaam grew up in an abusive home and detailed one instance of severe abuse, when he was hit with a baseball bat. In contrast, the evidence elicited during the PCRA hearings gave a much more detailed image of the home in which Abdul-Salaam was raised and highlighted the regularity with which Abdul-Salaam faced severe mental and physical abuse. Harris described Abdul-Salaam, Sr. as a "scary" figure who punched their mother in the face in front of the children, App. 384–85, and frequently severely abused Abdul-Salaam with a belt or balled fist. He also described a disturbing pattern in which Abdul-Salaam

31

would attempt to protect his mother and then would get punched by his father until he fell on the ground and eventually "just broke down." App. 390–92. Dana Goodman similarly testified with more disturbing detail than any of the witnesses at trial. For example, he said that more than once when petitioner was a small child, he saw Abdul-Salaam, Sr. hit petitioner until he was bruised and bleeding, and on multiple occasions saw Abdul-Salaam, Sr. hit petitioner with a blunt object. Goodman stated that he was too afraid to offer help because he, too, feared Abdul-Salaam, Sr. The other witnesses at the PCRA hearing similarly filled in the story with details of extreme violence that Abdul-Salaam suffered at his father's hands as a child and the serious poverty he experienced, including regular evictions and severe instances of lack of food as well as electricity. See, e.g., App. 453 (Florita witnessed Abdul-Salaam, Sr. taking money from Dovetta, taunting her, and then beating her while she was nude); App. 521 (Washington, Jr. recalling when Abdul-Salaam, Sr. threatened to kill Abdul-Salaam if he was not quiet); App. 749 (Lawrence saw Abdul-Salaam, Sr. hit Abdul-Salaam over the head); App. 395–96 (Harris recalling lack of food and evictions); App. 462–63 (Abey testifying about the lack of food in their childhood home and about when their father beat Abdul-Salaam with an aluminum bat for being noisy); App. 499 (Hall noting that there was rarely food in the house when she visited and that utilities were often turned off); App. 524 (Washington, Jr. recounting that Abdul-Salaam's family were extremely hungry when they visited); App. 720 (Goodman describing how Abdul-Salaam, Sr. sent all the family's money to the Nation of Islam).

This testimony was supported by the school and juvenile records that could have been presented to buttress the

32

family's claims of the abusive nature of the family home and the problems this caused for Abdul-Salaam starting from his childhood. See, e.g., App. 1626, 1631, 1634 (Green Tree School records discussing abuse Abdul-Salaam experienced at home); App. 1917 (Glen Mills School report opining that Abdul-Salaam's relationship with his father "appeared to be a major force in promoting [his] acting out and subsequent delinquent behavior"); App. 2095 (probation officer's view that Abdul-Salaam's problems were linked to his unstable home environment and his conflict with his father). The records also showed that throughout his childhood, Abdul-Salaam was described as suffering from various social and emotional issues, including what appeared to be significant anxiety and fearfulness, self-doubt, and learning disabilities, including ADHD. His school records further indicated that much of his childhood aggression and disruptive behavior was linked to these social, emotional, and learning issues and to his father's abuse. See, e.g., App. 1601 (Green Tree School records from 1981); App. 1622 (psychological evaluation in 1979 stating that Abdul-Salaam felt "'dumb' and 'stupid' and fe[lt] isolated from his peers because of his learning disability"). The evidence could have shown that, when removed from this detrimental environment, Abdul-Salaam's behavior began to improve, but that his progress was stymied by his premature removal from the programs and reunification with his father. See, e.g., App. 1788 (diagnosis from Wiley House that Abdul-Salaam was "salvageable" if placed in a supportive setting away from his father); App. 1826–27, 1849–50 (reflecting Abdul-Salaam's progress at ARC); App. 1917–18 (Abdul-Salaam adjusted well at Glen Mills, was released at Dovetta's request based on erroneous belief that his father had

left home permanently).[8]  Additionally, the mental health experts Abdul-Salaam presented at the PCRA hearing were able to explain the school records in the context of a child raised in an abusive home and how that context could explain the development of his issues with impulsive decision making, anxiety, aggression, and anti-social behaviors.  See, e.g., App. 873 (Dr. Fleming explaining how Abdul-Salaam's records showed the dynamics of an abused child); App. 1088–90 (Dr. Kessel explaining that a caregiver's abuse impairs a child's ability to make judgments as an adult); App. 1216–20 (Dr. Armstrong describing the damaging effects that abuse can have on a child's brain development).  None of these conclusions were squarely rebutted by the Commonwealth's experts, let alone addressed by the Commonwealth courts.

The evidence presented at the PCRA hearings — consisting of extensive and detailed testimony about the poverty and abuse that dominated Abdul-Salaam's upbringing, buttressed by the school records and mental health experts contextualizing those records — presented a far stronger mitigation case than the minimal mitigation testimony presented at trial, which presented the severe physical abuse as an uncommon, instead of dominant, feature of Abdul-Salaam's childhood.  If this additional evidence had been presented to the jury, it could have changed the picture of Abdul-Salaam's childhood from one that was abusive and poor in a general sense, with one or two more severe instances occurring over his entire lifetime, to one that appears to have been dominated

---

[8] At the PCRA hearing, Lappas noted that in past mitigation cases he has found this sort of "institutional adjustment" evidence useful.  App. 1304.

by severe and pervasive violence at the hands of his father and poverty that often rose to the level of serious deprivation.

We conclude that there is a reasonable probability that presenting the PCRA evidence at trial would have resulted in at least one juror according significantly greater weight to the catchall mitigating factor, thereby "convinc[ing] one juror to find the mitigating factors to outweigh" the aggravating factors. Blystone, 664 F.3d at 427. Consequently, Abdul-Salaam was prejudiced by trial counsel's errors because there is a reasonable probability that but for counsel's deficient performance in failing to adequately investigate — and ultimately present — this mitigation evidence, at least one juror would have voted against the death penalty and changed the outcome of the penalty proceedings. Having established both Strickland prongs, Abdul-Salaam is entitled to habeas relief.

## III.

For the foregoing reasons, we will reverse in part the Order of the District Court and remand to grant a provisional writ of habeas corpus directed to the penalty phase.