**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-3

GARY DUBOSE TERRY,

Petitioner − Appellant,

v.

BRYAN P. STIRLING, Commissioner, South Carolina Department of Corrections;
MICHAEL STEPHAN, Warden, Broad River Correctional Institution,

Respondents – Appellees.

------------------------------

NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS,

Amicus Supporting Appellant.

Appeal from the United States District Court for the District of South Carolina, at Florence.
Richard Mark Gergel, District Judge. (4:12−cv−01798−RMG)

Argued: January 25, 2021                                 Decided: May 5, 2021

Before WILKINSON, KEENAN, and DIAZ, Circuit Judges.

Affirmed by unpublished opinion. Judge Diaz wrote the opinion, in which Judge Wilkinson
and Judge Keenan joined.

**ARGUED:** Hannah Lyon Freedman, JUSTICE 360, Columbia, South Carolina, for
Appellant. William Edgar Salter, III, OFFICE OF THE ATTORNEY GENERAL OF

SOUTH CAROLINA, Columbia, South Carolina, for Appellees. **ON BRIEF:** Elizabeth Franklin-Best, ELIZABETH FRANKLIN-BEST, P.C., Columbia, South Carolina, for Appellant. Alan Wilson, Attorney General, Donald J. Zelenka, Deputy Attorney General, Melody J. Brown, Senior Assistant Deputy Attorney General, Caroline Scrantom, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellees. David B. Smith, Vice-Chair, Amicus Curiae Committee, NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS, Alexandria, Virginia; Marc Elias, Stephanie Command, Courtney Elgart, Washington, D.C., Reina Almon-Griffin, PERKINS COIE LLP, Seattle, Washington; Allison Franz, John H. Blume, CORNELL CAPITAL PUNISHMENT CLINIC, Ithaca, New York, for Amicus Curiae.

_____

Unpublished opinions are not binding precedent in this circuit.

2

DIAZ, Circuit Judge:

Gary DuBose Terry brutally murdered Urai Jackson after disconnecting her telephone, breaking into her home, and raping her. He was convicted and sentenced to death by a South Carolina jury. He appeals the district court's grant of summary judgment to the respondent state officials Bryan P. Stirling and Michael Stephan on his petition for writ of habeas corpus, brought pursuant to 28 U.S.C. § 2254.

Terry contends that his trial counsel provided ineffective assistance by failing to thoroughly investigate and present available mitigating evidence of abuse Terry suffered as a child and by failing to adequately question the venire during jury selection. Terry also argues that counsel in his state postconviction proceeding were likewise ineffective by failing to raise or investigate these claims.

The district court denied Terry's petition, holding that Terry failed to demonstrate cause to excuse the procedural default of the claims. We agree with the district court.

We again accentuate the high procedural bar erected by *Martinez v. Ryan*, 566 U.S. 1 (2012), which Terry fails to overcome because his claims are insubstantial. In so concluding, we exercise our discretion to reconsider issues that we implicitly resolved in Terry's favor by granting his certificate of appealability. *See Owens v. Stirling*, 967 F.3d 396, 403 (4th Cir. 2020). Accordingly, we affirm.

I.

A.

Terry's convictions for murder, first degree burglary, first degree criminal sexual conduct, and malicious injury to a telephone system trace back to May 1994. As recounted by the Supreme Court of South Carolina:

> The victim in this case, 47 year old Urai Jackson, was found beaten to death in her Lexington County home on May 24, 1994. The window on the carport door to her home had been broken out and the telephone wires had been pulled from the phone box. [Jackson]'s mostly nude body was found in the living room, and semen was found in her vagina. She had several blunt trauma wounds to the head, and a number of defensive wound injuries. The cause of death was blunt trauma with skull fracture and brain injury.

*State v. Terry*, 529 S.E.2d 274, 275–76 (S.C. 2000).

Terry's fingerprints were found on Jackson's telephone box, and the semen in Jackson's vagina contained Terry's DNA. Terry also admitted to police that he had sex with Jackson in her home and hit her with a blunt object.

B.

A Lexington County grand jury indicted Terry for the crimes described above. The state thereafter filed notice that it would seek the death penalty.

Terry was represented by Elizabeth Fullwood, the Lexington County Public Defender, and I. McDuffie Stone, a lawyer in private practice, who also served as a part-time prosecutor in another state judicial circuit and represented an entity that insures state

4

agencies and local governments.[1] They hired Vivian Massey, a mitigation specialist whom Fullwood had used in previous cases, to gather background and social history information from Terry.

During jury selection, Fullwood questioned a juror about her ability to impose either a life or a death sentence, and attempted to question the juror about her views on psychiatry. The court sustained the state's objection to this line of questioning.

Fullwood then questioned the juror about mitigation more generally, but again faced an objection when she began a question with "one reason to lessen the sentence under the law in this state is the mentality—[.]" J.A. 318. Fullwood argued that the line of questioning was appropriate under *Morgan v. Illinois*, 504 U.S. 719 (1992),[2] but the court again sustained the state's objection. It did, however, agree to read the relevant statutory mitigating circumstances from S.C. CODE ANN. § 16-3-20(C)(b)[3] to the jurors and ask

---

[1] Terry argued before the district court that Stone was operating under an actual conflict of interest because he served as a prosecutor and had government clients. Terry doesn't raise this argument on appeal, however, and has thus abandoned it. *See United States v. Al-Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004) ("[C]ontentions not raised in the argument section of the opening brief are abandoned.").

[2] Under *Morgan*, a capital defendant has the constitutional right to conduct sufficiently probing voir dire to discover, and exclude from the jury, prospective jurors who "would unwaveringly impose death after a finding of guilt." 504 U.S. at 733.

[3] These circumstances were that (1) "[t]he murder was committed while the defendant was under the influence of mental or emotional disturbance"; (2) "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired"; and (3) "[t]he age or mentality of the defendant at the time of the crime."

whether they could consider that evidence. The court also read the relevant statutory aggravating circumstances from § 16-3-20(C)(a).[4]

When questioning juror Norwood Brown, who submitted a post-trial affidavit in this case, Stone asked:

> [I]f you are in a position of sitting on a jury and you get in the position of finding somebody guilty of murder and another—like a rape or a burglary— and then you get into a sentencing phase, can you be fair to both the State and the defense and consider those aggravating and mitigating circumstances that the judge talked about earlier with you?

J.A. 496.

Brown answered, "Yes, sir." *Id.* Stone then asked, "So you could consider life and you could consider death, either way, even after you found somebody guilty?" *Id.* Brown again answered yes. Stone asked nearly identical questions of, and elicited nearly identical responses from, Robin Ritchie, the other juror who submitted a post-trial affidavit.

Following a two-day presentation of evidence, and after less than two hours of deliberations, the jury found Terry guilty of the offenses charged in the indictment.

## C.

### 1.

Terry's sentencing proceeding began the next day. The state's presentation included evidence of Terry's extensive criminal history and violent character.

---

[4] These circumstances were that "[t]he murder was committed while in the commission of the following crimes or acts: (a) criminal sexual conduct in any degree; . . . [and] (d) burglary in any degree." § 16-3-20(C)(a).

6

In 1985, Terry stole several items from a business called Imports Plus, including approximately eighteen items "such as sanders, things that would be utilized in a body shop, . . . to repair damage . . . on a vehicle." J.A. 361. That same year, Terry stabbed a woman in the throat, resulting "in a conviction for assault and battery of a high and aggravated nature." *Id.* According to the victim's statement, after stabbing her, Terry "just slowly walked to the door like he hadn't done anything. He was just so calm." J.A. 1135.

In 1988, Terry was convicted of resisting arrest, possessing a stolen vehicle, and other offenses. Terry committed additional infractions while in custody for these crimes, including disorderly conduct and bribery.

The state called several character witnesses. Jeffrey Douglas Ford testified that he had known Terry since 1988 and had helped Terry steal cars. While working with Terry to provide security at a bar, Ford saw Terry hit patrons with pool cues and rocks while breaking up fights. Ford also saw Terry hit a patron with a beer mug after the patron spilled beer on Terry's jacket.

Tyrone Kelly testified that Terry intentionally hit his car, causing significant damage and nearly hitting him, following a dispute over money that Terry believed Kelly owed him. Kelly further testified that Terry and another man wanted the money to buy "something to smoke." J.A. 363.

While in jail awaiting trial on Jackson's murder, Terry smashed the wall of his cell with a fire extinguisher. The state also presented a letter found in Terry's cell stating that Terry had conspired with Johnny Brewer, an inmate housed with Terry, to confess to a

7

murder for which Brewer was under arrest, whereupon Brewer would be released and then help Terry escape.

Angela Fedorchak testified about a violent incident involving Dianne Gibson, Fedorchak's friend and Terry's girlfriend.[5] When Terry arrived at the house where Fedorchak and Gibson were staying, Fedorchak told him that Gibson wasn't there. Undeterred, Terry forced his way into the house. Terry hit Fedorchak with a screen door hard enough to slam her into a wall and cause internal bleeding for which Fedorchak required medical treatment. Terry then forced Gibson to leave with him.

Gibson also testified for the state. She experienced Terry's "hot temper" during their relationship and said that Terry would throw things if she didn't do what he wanted. J.A. 366. After one fight, Terry left Gibson at a friend's house and, when she arrived home, she discovered that Terry had "busted her answering machine, torn up pictures and thrown things about her room." *Id.* (cleaned up). After another disagreement, Terry "threw [Gibson's] kitten up against the wall and threw the T.V. off the shelf." *Id.* Gibson testified, "[Terry] never physically abused me other than a few times just grabbing [her] by the arm, but . . . he controlled [her] emotionally and mentally." *Id.*

According to Gibson, Terry never held a legitimate job, stole boat and car trailers, and took money from each of her paychecks to buy crack. Gibson also recalled Terry telling her about a time when he beat a man "half to death" because he swore at Terry when Terry had told him to be quiet. *Id.*

---

[5] Terry was married at the time.

8

Gibson read the following excerpts from letters Terry sent her from prison:

Shit. I would not know how to change. I am me. Like I said, there is nobody like me and nobody will mess with me because they know I will hurt them. . . . I'm going to be just like I was before, maybe a little meaner than I was, but that's all. . . . I need to start calming down. I am getting too old for all this shit. I always loved to fight. I did it so good. It felt so good to hurt people that was bigger than me, but that's all behind me.

J.A. 367.

Gibson testified that Terry persuaded her to shoot him in the leg so that he could avoid going to court for back child support. She described how Terry had damaged her cars, once throwing a child's toy at, and kicking in the door of, her truck, when she tried to leave him. Terry burned one of Gibson's cars by "pouring lighter fluid in the dash and setting it on fire." J.A. 368 (cleaned up). Gibson recalled several incidents when she tried to leave Terry, and he threatened to burn her home or otherwise harm her family.

Gibson also testified about the incident Fedorchak had described. Earlier that evening, Gibson met up with Terry, who had been drinking. He gave her flowers and a bracelet. Gibson stated, "The conversation started off fine. I told him that I did not love him anymore, that I did not want to be with him. Then he got mad. He tried to punch out my passenger's side window of my truck." *Id.*

Gibson tried to leave, but Terry opened the hood of her truck and disabled the engine. Terry then promised to repair the engine if Gibson rode in his car with him. She did, and during the ride, Terry told her that he intended to force Gibson to watch him kill himself. Gibson jumped out of the car, but Terry picked her up and then took her back to

9

her truck and fixed the engine. Gibson left and eventually met up with Fedorchak before returning to her house.

Gibson then went into her bedroom, locked the door, and turned off the lights. She heard the altercation between Terry and Fedorchak, after which Terry broke into Gibson's room, grabbed her by the arm, and told her to leave with him. Gibson did, but drove very slowly, and when she saw blue lights behind her truck, she stopped and jumped out.

Gibson learned about Urai Jackson's murder the same day that Jackson's body was found. Three or four days later, Terry told her that a friend had gone to the crime scene and had told him that the phone box had been tampered with and that the glass on the carport was broken from the inside.

Tamatha Griffin, Terry's ex-wife, testified that Terry was physically abusive during their marriage and never provided well for the child they had together. Griffin filed for divorce on the basis of physical cruelty. She recounted the following:

> Gary told me that he had stabbed a prostitute in the neck and he had to leave. So he left and went to Florida. But prior to this, he would grab a hold of my arm. He wanted to take my car one night and I didn't want him to take it. So I had the keys in my hand and he was twisting my arm and finally he got the keys and he said that he was going to take the car and I said, well, you are not going to take the car without me in it. We were going down a dirt road and he opened my door and tried to push me out of the car.

> He's broken the windshield out of my stepfather's van. My stepfather took me to his mother's house and I got my car that was there and while I was trying to leave, he busted the windshield out of my car and the glass hit my face and cut my face.

J.A. 369–70. Griffin also testified that Terry raped her during their marriage.

10

The state introduced statements that Terry made to the police regarding Jackson's murder. Terry first told police that he had never been alone with Jackson inside her home. But he later claimed that he and Jackson had consensual sex inside her home, and he then fought with Jackson when he tried to leave against her wishes.

> The argument got pretty heated. I went to go out of the room and she grabbed me by the hair. I turned around and swung to get her off of me. I think I hit her and she went down to her knees.
>
> I, again, tried to walk out of the room. I got almost to the end of the hallway. She grabbed me from behind again. I then lost my temper. I swung back at her again. I then got something into my hand. It was just there in the hall. She could have brought it with her. I started hitting her with it. I lost my temper and I hit her several times. I have a bad temper.
>
> I then remembered leaving out of the same back door. I could have dusted [sic] a pane of glass on the door when I busted the door open.
>
> I don't remember pulling the phone lines. I don't remember what I did with the object that I used to hit Ms. Jackson. I can't remember what it was. I remember that I could hold it in one hand and it wasn't as big as a baseball bat.

J.A. 370–71.

The state also played a video of the crime scene and presented a blood spatter expert, who testified that "Jackson was laying on the ground or could have been no higher than nine inches off of the ground when she received her head wounds."[6]  J.A. 371.  The state

---

[6] We think the expert meant that Jackson's head, rather than her entire body, could have been no more than nine inches above the ground.

then called Dr. John B. Carter, the forensic pathologist who testified during the guilt phase, to more fully describe Jackson's injuries.

Carter testified that Jackson had a swollen right thumb, which "could have happened warding off a blow or it could have come from having the hand on the floor one side up or the other side up and then being stomped on or being struck sharply with a hard object." J.A. 372 (cleaned up). Jackson had other injuries to her arms consistent with defensive wounds, as well as extensive injuries to her right shoulder consistent with the use of two weapons. According to Carter, all of Jackson's injuries were consistent with "some type of a prolonged struggle and probably not a one blow to the ground type of episode." *Id.* (cleaned up).

As to Jackson's head wounds, Carter explained that there were "at least four different tracks that we can see, although, there may have been more blows superimposed on the original and the force was such that the skull just behind the right ear was crushed and depressed in multiple places." J.A. 373. Jackson's skull "was crushed and smashed inward somewhat like punching against an eggshell." *Id.* Jackson, said Dr. Carter, was found with her legs spread apart, with semen matched to Terry in her vaginal canal. He explained that "the position of the victim's body is very characteristic of positions the victims are found in that have been engaged in sexual activity or assault at the time of death. The legs are spread apart and death occurs and they stay that way." *Id.*

### 3.

In mitigation, Terry presented evidence of his upbringing and of damage to his brain. Terry's mother, Patricia, testified that, when Terry was about four years old, his

father, Bill Terry, was injured in an accident and could no longer work. Though Bill received workers' compensation, it wasn't enough to support the family. Patricia thus worked outside the home, first at a sewing room and then at a textile mill.

The accident not only made finances tight, but also changed Bill's personality, making him more irritable and unable to tolerate the noise of children playing. According to Patricia, Bill would leave the room when the children were playing. But she said nothing about him becoming angry at the children, let alone abusing them.

Patricia explained that Terry, the youngest of five, was a "loner" as a child and was content to play by himself. J.A. 686. Terry didn't participate in any traditional childhood activities, such as scouting or little league, because he "didn't have an attention span to sit . . . for longer periods." J.A. 687. In the second or third grade, Terry was tested and determined to have a learning disability and be "borderline retarded." *Id.* He was placed in special education classes, but his parents didn't tutor him or otherwise help him academically.

Patricia testified that, starting around age 13, Terry "and his brothers fought a lot. . . . And even though he's the smallest of them, he would still hang in there." J.A. 688. Terry also "had a lot of run-ins with his dad." *Id.* However, Patricia claimed that none of the fights required intervention by law enforcement.[7]

---

[7] A defense expert later testified that Terry's parents had his brothers arrested for abusing him.

One night, when Terry was 13, he blocked the door of his bedroom with a dresser, wrapped himself "cocoon style" in a blanket, and inhaled the fumes from a can of glue remover and a tube of "airplane glue." J.A. 689–90. Patricia and Bill forced their way into Terry's bedroom and found him unconscious. Terry's parents were able to revive him by taking him outside, but he was disoriented when he regained consciousness. Aside from having Patricia's brother-in-law, who was a doctor, visit Terry at their house the following day, Terry's parents didn't seek any medical or mental health treatment for him.

When Terry was about 14, he got into a fight with one of his brothers, during which he threw a brickbat through the window of a van that his brother was restoring. Terry's father tried to break up the fight, but when Terry "came at him," Bill swung a board at Terry with enough force to break Terry's collarbone. J.A. 692.

Patricia also testified to symptoms of apparent internal injuries and brain damage in Terry following a fall from a tree while working for a tree-trimming company in Florida, where he fled after committing the 1985 stabbing. Terry repeatedly coughed up blood while in jail for the stabbing and following his return home, though doctors were unable to determine the cause of the bleeding. Patricia also stated that:

> I've seen him stagger before. I've seen him go do something and just completely forget what he was doing. And he's—it's like I said, he just staggers. I've never seen him completely black out, but I have seen him forget what he was doing or just completely stop and turn around. And they've given him all kinds of medicine. They've even taken him to the hospital and put medicine in his veins for migraine headaches and . . . they stop for a while and then they come right back.

J.A. 702.

14

Bill Terry described an incident when Terry, age 10 or 12 at the time, intervened when neighborhood children "started cursing . . . and throwing rocks" at Bill. J.A. 731. Bill said that Terry helped around the house and was a "good kid." J.A. 732. Bill did not, however, testify to other mitigating circumstances in Terry's life beyond affirming his wife's testimony that his ability to provide for the family and to tolerate the noise of children playing diminished after his accident.

Lou Ann Smith Terry, Terry's wife and the mother of four of his children, told the jury that Terry had a loving relationship with his children and that, despite his actions, she continued to love him. She also pled with the jury for Terry's life.

On cross, the state confronted Ms. Terry with statements she had made during a psychosocial assessment of Terry as part of his admission to a hospital for drug treatment. Among these were assertions that Terry "lies compulsively," "seems to have no boundaries," is "very manipulative," has a "violent temper," "liked having his own way" or was "spoiled," "is very immature and dependent," "does not see himself as an addict or an alcoholic," and "shows no concern for the rights or needs of . . . his wife or others." J.A. 749–50. Ms. Terry did not deny making the statements, but could recall only some of them.

Counsel also presented four expert witnesses: Jan Vogelsang, an expert in social work; Dr. Robert Deysach, an expert in clinical neuropsychology; Dr. David Bachman, an expert in behavioral neurology; and Dr. Donna Schwartz-Watts, an expert in forensic psychiatry.

Vogelsang explained the relationship between Terry's upbringing and brain damage. Terry "was born to parents whose own lives and circumstances of their lives had made it very difficult for them to parent effectively and for that reason, they had great difficulty providing any more than very basic needs for their children. Especially[] after his father's accident." J.A. 769–70.

According to Vogelsang, Terry "did have some special developmental needs as well and there were no resources available for those and no family members close by who could . . . or who did step in and take over to help this family." J.A. 770. Vogelsang told the jury that one side of Terry's family has a history of alcohol abuse, and there is a pattern throughout the family of "some rather unusual medical problems" and "learning and emotional problems." *Id.* Vogelsang also said:

> [Terry] has a documented history of learning disabilities and certainly a history with . . . [in]attentiveness[,] impulsivity, poor judgment, explosive outbursts and other behavioral indications that later have turned out to be attributable to a medical condition that causes changes in his behavior.
>
> . . . . His ability to control these outbursts, to restrain his behavior, to forecast consequences, to learn from experience are greatly impaired. . . .
>
> . . . [But], with medical intervention, it is entirely possible that he will be able to restrain himself, control his behavior and adapt to prison life.

J.A. 770–71.

Vogelsang interviewed Terry four times and also spoke with Terry's wife, mother, father, two sisters, two brothers, sister-in-law, former girlfriend, ex-wife, two sons, daughter, two aunts, uncle, great aunt, and great uncle. Vogelsang characterized Terry's parents as "the poster children for bad luck" and stated, "I think they did care. They just

simply either did not know what to do or did not have the energy to do it." J.A. 785–86.

Notwithstanding Terry's father breaking Terry's collarbone with a board and his brothers being arrested at his parents' behest for abusing him, Vogelsang explained:

> [I do not mean to] imply that family violence was the same in this family as it is in a lot of families because that's not what I found here. There is some violence. I would not say it's the kind of pervasive violence you find in a lot of homes where battering takes place. But certainly, at an early age, I think [Terry] was already probably giving signs and cues that something was terribly wrong.

J.A. 784.

According to Vogelsang, Terry's parents failed to seek help for him after they discovered him inhaling glue and that, when Terry was eight, he observed an older brother inhale gasoline fumes, also with no parental intervention. Though Vogelsang didn't say that Terry suffered significant abuse, she did testify that Terry's older brothers and his sister had all lost custody of their children because they either abused or neglected them. Vogelsang opined, "Because we have given so much attention to physical and sexual abuse, . . . we have not given enough attention to the impact of *neglect* on children and that . . . is one of the keys for children ending up in the criminal justice system." J.A. 783–84 (emphasis added).

Next up in mitigation was Dr. Deysach, who testified that, based on various tests of Terry's cognition and behavior, Terry had an abnormality in the right frontal lobe of his brain and that Terry's behavioral abnormalities were consistent with his findings of damage to this area of the brain. Deysach's findings were also consistent with a diagnosis Terry had received in 1994 of organic explosive disorder, a condition which interfered with

17

Terry's ability to regulate his behavior, particularly when he was under emotional strain. Deysach concluded that Terry had a "neuropsychological deficit." J.A. 825.

Dr. Bachman showed the jury scans of Terry's brain which indicated an area of reduced activity in his right frontal lobe. Bachman then explained:

> When somebody has an abnormality [sic] function in that part of the brain, there are two sets of problems that you see. On the one hand, they have difficulties on certain types of testing such as [those administered by] Dr. Deysach . . . .
>
> The other thing that we know is that people who demonstrate those sorts of abnormalities . . . also frequently have other kinds of behavioral problems as well. And those behavioral problems include such things as irritability, impulsivity, aggressive behavior, explosive aggressive behavior, poor planning in terms of thinking about the [repercussions] of behavior[,] and these are very typical of patients who have had lesions such as head injury or other such abnormalities of that part of the brain.
>
> So the fact that he has the . . . abnormality in the neurospect scan, the fact that he has the abnormality on the neuro-psyc[h] testing, it's very, very strong evidence that you would also expect to find these other behavioral problems.

J.A. 843. Bachman affirmed that his findings were consistent with Terry's earlier diagnosis of organic explosive disorder and explained that patients with this type of brain injury "don't necessarily come in conflict with the law, but they sure have come in conflict with their family." J.A. 844.

Dr. Schwartz-Watts diagnosed Terry with an "organic mental disorder" not otherwise specified. J.A. 867. She told the jury:

> [I]t's a major mental disorder and it's organic in nature, meaning that it comes from the brain, brain damage or dysfunction in the brain compared to chemical imbalances or personality disturbances and it affects his thinking, his feelings and his behavior.
>
> . . . .

18

The way it affects his thinking, people with this type of brain damage, as demonstrated by Dr. Deysach and Dr. Bachman, and also consistent with my clinical findings, they can at times become suspicious and paranoid.

. . . .

And then in terms of behavior, they can be quite aggressive, explosive. They can have sexual indiscretions. They can be very impulsive, very, very impulsive people.

J.A. 867–68. Schwartz-Watts also stated that the aggravating circumstances the state presented were consistent with her findings.

In their closing arguments, Terry's lawyers emphasized the impact of Terry's brain damage on his violent behavior. Fullwood and Stone both stated that Terry's parents were not at fault for his behavior. Fullwood argued that Terry's parents "tried hard," pointed to "their pain and their shame," and said that there was "no reason to hurt them more" by executing Terry. J.A. 897.

After deliberating for a little over an hour, the jury recommended that Terry be sentenced to death. The court imposed that sentence, as well as consecutive sentences of life imprisonment for first degree burglary, thirty years for first degree criminal sexual conduct, and ten years for malicious injury to a telephone system.

D.

Terry appealed and the Supreme Court of South Carolina affirmed. *State v. Terry*, 529 S.E.2d 274 (S.C. 2000), *cert. denied sub nom. Terry v. South Carolina*, 531 U.S. 882 (2000). Terry thereafter sought postconviction relief in state court. Terry's counsel raised multiple grounds for relief concerning trial counsel's performance, none of which are at issue here. Following an evidentiary hearing, the state trial court denied Terry's application

19

for postconviction relief and dismissed it with prejudice. The state Supreme Court affirmed. *Terry v. State*, 714 S.E.2d 326 (S.C. 2011), *cert. denied sub nom. Terry v. South Carolina*, 565 U.S. 1206 (2012).

E.

Terry next pursued habeas relief in federal court.[8] His federal habeas petition raised five grounds for relief, two of which he pursues on appeal:

> III. Petitioner's rights to the effective assistance of counsel and to a fair and impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution was [sic] violated by trial counsel's failure to conduct adequate and appropriate voir dire or to adequately establish a record and appropriately object in order to preserve the issue for appellate review.
>
> . . . .
>
> IV. Petitioner's right to the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution was violated by trial counsel's failure to develop evidence supporting a defense of guilty but mentally ill and failing to adequately investigate and present mitigation evidence during the trial and sentencing when trial counsel failed to present substantial and highly mitigating evidence of Gary Terry's childhood abuse.

J.A. 31, 35. Both grounds were procedurally defaulted, because Terry's counsel in the state postconviction proceeding didn't raise them.

Terry attached to his petition several affidavits (including from two of the experts who testified at trial) and other documentary evidence of childhood abuse that, he argues, trial counsel were deficient in failing to uncover and present as mitigating evidence. Terry

---

[8] Terry also sought to exhaust his state remedies in a contemporaneously filed application for postconviction relief in state court. But the state court dismissed Terry's application as time-barred and improperly successive.

20

also attached affidavits from two jurors who say that they didn't consider a life sentence and that the jury didn't discuss giving Terry a life sentence during deliberations. Finally, Terry presented affidavits from his trial and state postconviction counsel to show that counsel had no strategic reason for failing to investigate or present evidence of abuse.

Terry's submission to the district court painted a picture of a childhood marred by his father's abuse. Some of the evidence appears in the notes of the experts retained by trial counsel. Massey's notes from a pretrial interview of Terry record the following description of Terry's childhood:

> Discipline: Gary stated, "My daddy beat the shit out of me with a belt." He explained that his daddy has health problems (burned, busted back, migraines) and he has a temper. He (daddy) whipped hard enough for the whelps [sic] to bleed. He (daddy) slapped him (Gary) on his face, on the side of his head or whatever he could reach when he got mad. His daddy would cuss him when he got blamed for doing something. He said, "My brother Johnny would do stuff and blame it on me and I would catch hell for it." All of the children got whipped like that.
>
> Gary remembered one time when he was in high school (16–17 years old) and was talking on the telephone at home. His daddy came by and said something . . . the cussing started and Gary tried to run away. His daddy hit him across the back with something and broke his shoulder blade. Gary remembers being taken to either Richland or Baptist Hospital.
>
> Gary said his mother was usually home when all this was going on but she tried to stay out of the way. One time she got in between them and got hit. His mother didn't discipline him—she left it up to his daddy.

J.A. 55.

Vogelsang's handwritten notes from the interviews she conducted also refer to abuse. Terry's sister-in-law, Patty Terry, reported that "Patricia step[ped] in to stop Bill beating boys and would get it" and also that "Bill saw kids as workhorses . . . not allowed

21

to play." J.A. 58, 345. Vogelsang's notes following her interview with Terry's brother, Billy Terry, reflect: "Daddy tore everyone up including him if Mom had to be awakened"; "Strap—hung behind door"; "couldn't go to school—didn't want teacher to see marks." J.A. 345. From her interview with Faye Servoss, Terry's sister, Vogelsang noted: "Fa [sic] wld tie kids to tree in front yard & have beat each other"; "Dad beat before accidents"; "Daddy made them fight each other"; and "Billy worked kids to death . . . like dogs." J.A. 70, 75, 345–46.

In Vogelsang's post-trial affidavit, she states, "[I]t is apparent that Gary and his siblings suffered significant abuse at home. It would have been typical of me to make this known to the attorneys and to stress the impact of trauma on development."[9] J.A. 78. Vogelsang does not, however, have any memory of this case, which, she assumes, was because Terry's trial team was not "active and cohesive." *Id.* Vogelsang explained that the lack of testimony concerning Terry's abuse must have been attributable to "the lack of a true team effort, lack of funding, or trial counsel specifically instructing [her] not to talk about the abuse, or a combination of all three." J.A. 79. But she dismissed lack of funding as a possible reason, because her professional ethics code would have required her to work

---

[9] Because Vogelsang's post-trial affidavit contradicts her trial testimony concerning the severity of the childhood abuse Terry suffered and the greater importance of neglect to Terry's development, it doesn't establish a genuine issue of material fact at summary judgment. *See Erwin v. United States*, 591 F.3d 313, 325 n.7 (4th Cir. 2010) ("[I]t is well established that a genuine issue of fact is not created where the only issue of fact is to determine which of the two conflicting versions of [an affiant's] testimony is correct." (cleaned up)). *See also Rohrbough v. Wyeth Lab'ys*, Inc., 916 F.2d 970, 976 (4th Cir. 1990) (holding that an expert's affidavit which contradicted his deposition testimony did not create an issue of fact at summary judgment).

on the case, once retained, even if she had not been paid. Vogelsang also doesn't remember state postconviction counsel speaking to her about the case.

In her affidavit, Patricia Terry states that Bill, Terry's father, "whipped the children with a belt almost daily." J.A. 82. Terry's father prohibited the children from playing outside, sometimes making them work until 10:00 at night. Patricia also provided an account of Bill breaking Terry's collarbone inconsistent with her account at Terry's sentencing proceeding (while indicating that she did not witness the actual incident):

> Bill used to have the children "fight it out" among themselves. One day, when Gary was between 12–14 years old, he and Johnny were fighting in the garage area. Bill was there, too, but did not stop the fight. Johnny is much bigger and stronger than Gary. Gary picked up a brick and threw it at Johnny. The brick broke the windshield of Bill's car and then Bill hurt Gary. He broke his collarbone, and I think he did so by hitting him with a board that was in the garage. I was at work when this happened.

J.A. 83.

Patricia claimed that Bill would throw out the children's dinner if they were served before he was or if he didn't like what she cooked for dinner. Bill often threatened to "blow [her] brains out" in front of the children. J.A. 85. Patricia further explained, "I did not testify about the information included in this affidavit. I simply answered the questions asked of me and no one asked about these things while I was on the witness stand." *Id.* Patricia did not, however, say that she discussed this information with Terry's attorneys.

In a lengthy affidavit, Faye Terry Servoss, Terry's older sister (who was not a witness at Terry's trial), testified to her father's significant abuse of various family members, including severe beatings, animal torture, and seeing her father force her mother to eat a pack of cigarettes because he was angry about her smoking. Faye also testified that

23

her mother said, "that one's ruined, that's okay, we've got another" to her father after a neighborhood boy raped her when she was a child. J.A. 87 (cleaned up). But the only incident relating to Terry that she described in her affidavit was his father breaking Terry's collarbone. Faye also stated that she would have testified at trial to the abuse if she had been subpoenaed.

Charles Register, Patricia Terry's brother, provided a brief affidavit describing Terry's father's abuse of his wife and children. Register testified that he saw Terry's father "viciously beat" Terry with a stick when Terry was six or seven years old. J.A. 94. Register also testified that "[he] was available and would have testified to these events had [he] been contacted by defense counsel." J.A. 95.

Finally, Francis Terry, the former wife of Terry's older brother Billy, submitted an affidavit in which she testified to severe abuse that Billy inflicted upon her and one beating that Billy told her his father had given him. But she also said that, though Terry's father was "hard" and "real strict," she never saw him hit his children. J.A. 98.

In her affidavit, Dr. Schwartz-Watts stated, "I did not review, because I was not provided, detailed interviews with various family members conducted by defense counsel's mitigation investigator, Vivian Massey, nor did I review, because I was not provided, any of the materials assembled by Jan Vogelsang, the social worker hired by defense counsel." J.A. 101.

After receiving this information and the affidavits of family witnesses from habeas counsel, Schwartz-Watts reexamined Terry in May 2012. Had Schwartz-Watts known about the abuse Terry suffered, she would have testified at trial that Terry suffered effects

24

from trauma, including missing memories, intrusive thoughts of childhood abuse, and inability to form healthy relationships. According to Schwartz-Watts, "[t]his information is mitigating in its own right, but is also significant with respect to significant brain dysfunction, as the abuse may have actually contributed to the dysfunction." J.A. 102. "Terry," she said, "had more neurological dysfunction than any patient I have ever evaluated, including those prior to 1997 and since." *Id.* Dr. Schwartz-Watts didn't recall hearing from Terry's counsel in the state postconviction proceeding, although she knew and worked with these attorneys on other cases.

In her affidavit, Fullwood says that "[i]f the evidence of Gary Terry's substantial physical abuse was not provided to Dr. Schwartz-Watts it should have been." J.A. 47. Fullwood also did "not recall making any strategic decision to limit the mitigation testimony of Gary's family members or to avoid presentation of evidence that he had suffered significant abuse as a child." *Id.* She stated that it was her "intent to present all of the evidence of that nature that [she] could and all that [she] was aware of was presented." *Id.* Fullwood also didn't discuss the case with Terry's counsel in the state postconviction proceeding before testifying. She deemed this unusual, since postconviction counsel generally interview trial counsel before calling them to the witness stand.

Terry's postconviction counsel filed affidavits stating that they spoke with Terry's parents and one of his ex-wives but did not develop additional mitigation evidence from these conversations. Their affidavits do not, however, specify whether they questioned

25

Terry's family members about abuse or indeed what they discussed with Terry's family members during the interviews.

Postconviction counsel didn't interview or speak with Massey or any of the four expert witnesses who testified at trial. They don't recall interviewing any jurors in Terry's trial. If they had known of the abuse Terry suffered as a child, they would have argued that trial counsel were ineffective for failing to present this issue to the jury.

The affidavits of jurors Brown and Ritchie assert that the jury didn't consider a life sentence for Terry. *See* J.A. 49 (Brown testifying, "[W]e made the [sentencing] decision easily and were all in agreement. We did not discuss giving [Terry] a life sentence."); J.A. 51 (Ritchie testifying, "We did not discuss giving [Terry] a life sentence."). Brown said, "Based on the fact that [Terry] committed a murder plus rape and burglary, there was nothing he could have said or done to make me give him a life sentence. I believe the death penalty is the right punishment for murder if there are also other crimes." J.A. 49. Ritchie stated that "the defense lawyers' attempts to evoke sympathy did not work" and explained, "[T]he evidence regarding his brain injury did not impact me. What I cared about was whether he knew right from wrong, and he did, so in my opinion he did not deserve a life sentence." J.A. 51.

The district court granted summary judgment to the state on Terry's habeas petition and adopted the magistrate's 144-page Report and Recommendation as the order of the court. *Terry v. Stirling*, No. 4:12-1798-RMG, 2019 WL 4723345, at *1 (D.S.C. Sept. 26, 2019). The district court also denied Terry's request for an evidentiary hearing. *Id.* at *9.

26

Terry, said the district court, had "not made specific factual allegations that, if true, would entitle him to habeas relief and ha[d] failed to demonstrate the substantiality of his underlying ineffective assistance of counsel claims." *Id.* The district court arrived at this conclusion for four related reasons: (1) Terry's trial counsel presented some evidence of Terry's childhood abuse; (2) Terry presented no evidence that trial counsel knew more information about the abuse than they presented; (3) any deficiencies in trial counsel's presentation were attributable to their experts' failure to inform them of childhood abuse Terry suffered, for which trial counsel cannot be faulted; and (4) the record suggests that Vogelsang, counsel's expert in social work, did not deem the abuse significant when she testified at Terry's sentencing. *Id.* at 12.

The district court also held that Terry's trial counsel conducted an adequate voir dire. It noted that counsel asked both jurors Brown and Ritchie[10] whether they could consider either a life or a death sentence depending on the circumstances, even after finding Terry guilty of murder and other crimes, and both jurors answered in the affirmative. *Id.* at *11. Terry, said the district court, "was permitted to do exactly what *Morgan* requires, namely, he inquired whether each of these jurors had predetermined whether or not to impose the death penalty, with each one confirming, with the benefit of knowing both the statutory mitigating factors and that they would have already found Petitioner guilty of murder plus an additional criminal act, that they could impose either a sentence of life in

---

[10] The district court refers to Brown and Ritchie as Juror #35 and Juror #214 respectively.

prison or death." *Id.* at *12. And the trial court didn't improperly curtail counsel's voir dire, because South Carolina law prohibited the questions that counsel wished to ask regarding the jurors' views of psychiatry. *Id.* at *11–*12.

This appeal followed.

## II.

"We review the district court's denial of habeas relief on summary judgment de novo." *Sigmon v. Stirling*, 956 F.3d 183, 191 (4th Cir. 2020). "[U]nder certain circumstances, including raising a claim under *Martinez*, a petitioner may excuse a state court procedural default." *Id.* (citing *Martinez*, 566 U.S. at 17). "In such cases, a federal court considers those claims de novo." *Id.*

"We review a district court's decision to deny a habeas petitioner an evidentiary hearing for abuse of discretion." *Id.* at 198. "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).

"Generally, if a claim is procedurally defaulted in state court, federal habeas review is barred 'unless the prisoner can demonstrate cause for the default and actual prejudice.'" *Sigmon*, 956 F.3d at 198 (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). "And ineffective assistance of state post-conviction counsel generally cannot establish cause for the default because there is no constitutional right to an attorney in state post-conviction proceedings." *Id.* (cleaned up). "However, when state law requires 'claims of ineffective

28

assistance of trial counsel [to] be raised in an initial-review collateral proceeding' and not on direct review—which South Carolina law does—procedural default does not bar federal habeas review of 'a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.'" *Id.* (quoting *Martinez*, 566 U.S. at 17).

"Accordingly, to invoke *Martinez* and obtain federal habeas review of a claim defaulted in state court, [Terry] must demonstrate that state habeas counsel was ineffective or absent, and that the underlying ineffective assistance of [trial] counsel claim is substantial." *Id.* (cleaned up). "To demonstrate that 'the underlying ineffective-assistance-of-trial-counsel claim is a substantial one,' [Terry] must show 'that the claim has some merit.'" *Id.* (quoting *Martinez*, 566 U.S. at 14).

"To demonstrate ineffective assistance of counsel, '[a] petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.'" *Id.* at 192 (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)). "A deficient performance is one that falls 'below an objective standard of reasonableness.'" *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).

"In this analysis, we must resist the temptation to second-guess counsel's assistance after conviction or adverse sentence and instead must make every effort to eliminate the distorting effects of hindsight." *Id.* (cleaned up). "The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (cleaned up). As we recently held:

29

[A] state prisoner satisfies *Martinez* by showing, *first*, that initial postconviction counsel performed deficiently, under the first prong of *Strickland*, by failing to exhaust the underlying ineffective-assistance-of-trial-counsel claim, but not that said counsel's deficient performance was prejudicial, under the second prong of *Strickland*; and *second*, that the underlying claim is substantial, or has some merit, with respect to both prongs of *Strickland*.

*Owens*, 967 F.3d at 423.

## A.

We first turn to Terry's argument that his trial counsel was deficient under *Strickland* for failing to present additional evidence of childhood abuse.[11]  As we explain, we hold that this claim is insubstantial under *Martinez*.

## 1.

We begin our analysis by considering the actual performance rendered by trial counsel in sentencing.  Though unsuccessful in persuading the jury, Terry's lawyers presented a coherent mitigation case with a clear theory for why the jury should have voted for life.

First, counsel attempted to humanize Terry and presented extensive evidence of his difficult childhood through testimony from his mother, father, and wife.  Terry's mother testified to violent fights between Terry and his older brothers, Terry's possible teenage suicide attempt when he blocked the door of his room with a dresser and inhaled glue fumes until he lost consciousness, and the incident in which Terry's father broke Terry's collarbone with a board during a fight between Terry and one of his brothers.  Indeed,

---

[11] Given our disposition, we don't address whether state postconviction counsel were ineffective in failing to exhaust the claim.

Terry's father breaking his collarbone is one of the few specific instances of abuse against Terry to which the affiants testify. *See* J.A. 83 (Terry's mother Patricia describing this incident); J.A. 90 (Faye Servoss, Terry's older sister, describing this incident, the only specific instance of abuse against Terry she mentions in her 36-paragraph affidavit).

Terry's mother also testified to obvious symptoms of brain damage, including headaches and times when Terry would stagger and forget what he was doing while doing something. Terry's father then testified to occasions when Terry helped his family, and Terry's wife testified to Terry's loving relationship with his children and the pain that his execution would inflict on them.

Terry's counsel didn't limit their mitigation case to testimony from his family members, however. They also called four experts, all of whom presented unrebutted evidence of Terry's brain damage and its effects on his behavior—particularly his ability to control his impulses and make decisions. Vogelsang, who interviewed multiple family members and also interviewed Terry four times, testified at length to the impact of Terry's neglectful, and at times violent, childhood on his character. Then in closing, Terry's counsel argued that the jury should spare his life, because executing him would inflict unnecessary additional pain and shame on his family, and because Terry's brain damage diminished his responsibility for his violent behavior.

2.

Terry's new lawyers now characterize Terry's childhood as far grimmer than even the less-than-idyllic picture that trial counsel painted. With the benefit of hindsight and

31

following an adverse sentence, Terry argues that trial counsel were deficient for failing to present this additional evidence of childhood abuse.

But the district court rejected this argument, and for good reason. The evidence shows that counsel, through the defense team, discovered and presented relevant information about abuse, particularly the incident in which Terry's father broke his collarbone with a board. *See* J.A. 692 (where Patricia describes this incident in her trial testimony).

Counsel also intended to present all evidence regarding abuse to the jury. And they don't say now that they knew about the evidence of abuse in the notes prepared by Massey and Vogelsang.

That said, it appears that Fullwood did have Massey's typewritten notes in her case file. Indeed, in the state postconviction proceeding, Fullwood referred to these notes in answering questions about information that Terry provided the trial team during the team's investigation. But Fullwood didn't testify (nor was she asked) whether she reviewed those portions of Massey's notes describing Terry's childhood abuse.

Though it's unclear whether Vogelsang's handwritten notes (which are difficult to read in places) were in counsel's file, Vogelsang presumably reviewed them and concluded that neglect had a greater impact on Terry's behavior than the abuse of which she was aware. Given that Vogelsang interviewed Terry multiple times and spoke with several of Terry's family members (including all but one of the relatives that have submitted post-trial affidavits), counsel had no reason to believe that Vogelsang's opinion was unfounded or that Vogelsang failed to fully inform them of the circumstances of Terry's childhood.

32

While counsel may not abdicate their responsibility to investigate their client's case, it's not unreasonable or contrary to prevailing professional norms for counsel to rely on a qualified mitigation investigator or other experts. *See Rhode v. Hall*, 582 F.3d 1273, 1283 (11th Cir. 2009).[12] Terry's counsel were also entitled to rely on Vogelsang's expert opinion concerning the causes of Terry's behavior. *See Wilson*, 155 F.3d at 403 (holding that, to be reasonably effective, trial counsel is not required to "second-guess" their expert's opinions).

But even if counsel could be faulted for not highlighting evidence of Terry's abuse more forcefully, they were by no means constitutionally deficient—particularly in light of the robust mitigation case that was presented. We agree with our sister circuit that "perfection is not the standard of effective assistance." *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995) (en banc). And failures to present or develop certain evidence don't necessarily rise to deficient performance or prejudice under *Strickland*. *See Byram v. Ozmint*, 339 F.3d 203, 210–11 (4th Cir. 2003) (trial counsel not deficient for failing to obtain petitioner's adoption records, which might have provided additional evidence that he suffered from fetal alcohol syndrome and more evidence of childhood trauma, when counsel made reasonable efforts to obtain the records and otherwise presented a robust mitigation case concerning petitioner's "troubled childhood and adolescence").

---

[12] Nor is there a right to effective assistance of expert witnesses or mitigation investigators. *See Wilson v. Greene*, 155 F.3d 396, 401 (4th Cir. 1998) ("The Constitution does not entitle a criminal defendant to the effective assistance of an expert witness.").

Now, with the benefit of hindsight, Terry argues that counsel should have emphasized abuse and de-emphasized neglect in their mitigation case. But "[t]he widespread use of the tactic of attacking trial counsel by showing 'what might have been' proves that nothing is clearer than hindsight—except perhaps the rule that we will not judge trial counsel's performance through hindsight." *Waters*, 46 F.3d at 1514. We are satisfied that counsel conducted a reasonable investigation "and they cannot be held accountable for information Petitioner and his family failed to provide or their experts failed to convey." *Terry*, 2019 WL 4723345, at *14.

The cases on which Terry relies to contend otherwise are distinguishable. In *Rompilla v. Beard*, 545 U.S. 374, 383 (2005), for example, the Supreme Court held that counsel were deficient for failing to review the record of the defendant's prior conviction for rape and assault. The file at issue, which was a readily available public record, contained the transcript of the rape victim's testimony that counsel knew the prosecutor intended to use as aggravating evidence at the sentencing phase of Rompilla's trial. *Id.*

If counsel had reviewed the file, which also contained Rompilla's prison records from his incarceration for that prior conviction, they would have "found a range of mitigation leads that no other source had opened up," including evidence that Rompilla was raised in a "slum environment," suffered from various psychological disorders, and had test scores indicating a third-grade level of cognition. *Id.* at 390–91. These records "would have destroyed the benign conception of Rompilla's upbringing and mental capacity defense counsel had formed from talking with Rompilla himself and some of his family members, and from the reports of the mental health experts." *Id.* at 391.

34

The facts of *Rompilla* are far removed from Terry's case. For starters, Terry neither alleges nor shows that trial counsel failed to examine records they knew, or should have known, that the state would use as aggravating evidence. He argues instead that counsel missed "numerous red flags," Appellant's Br. at 32, which should have alerted them to the abuse Terry suffered as a child, that they had no strategic reason to limit their investigation or presentation of this mitigating evidence, and that their failure to present the evidence of abuse they already had "suggest[s] that their incomplete investigation [and presentation] was the result of inattention, not reasoned strategic judgment." *Id.* at 31 (quoting *Wiggins*, 539 U.S. at 534).

But the record is, at best, ambiguous as to whether Terry's counsel failed to review the evidence of abuse they had. And even if they did, this error doesn't amount to deficient performance, particularly when juxtaposed with the robust mitigation case that they did present.

Terry also cites to *Winston v. Pearson*, 683 F.3d 489 (4th Cir. 2012) for the related propositions that attorneys are "obligated to be familiar with readily available documents necessary to an understanding of [their client's] case," and forbidden from relying on an expert to "ascertain their import." *Id.* at 505 (cleaned up). There, we held that Winston's counsel were deficient for failing to read his school records—which revealed an IQ low enough to qualify him as intellectually disabled, thus *barring his execution*—and weren't entitled to rely on an expert to ascertain the import of these records.

But *Winston* is distinguishable from this case for the same reasons *Rompilla* is: The records at issue were easy to obtain and required no effort on trial counsel's part to

35

decipher. *Winston* is also distinguishable because counsel's errors there led them to fail to raise the claim that Winston's intellectual disability categorically barred a death sentence. 683 F.3d at 492–93. Here, by contrast, the alleged deficiencies in not presenting the evidence of physical abuse merely failed to bolster an already strong mitigation case that included some evidence of abuse. And none of this evidence would have categorically barred the imposition of a death sentence.

Terry also relies on *Abdul-Salaam v. Secretary of Pennsylvania Department of Corrections*, 895 F.3d 254 (3d Cir. 2018), in which our sister circuit deemed counsel deficient for failing to investigate significant evidence of mitigating childhood abuse. But counsel in *Abdul-Salaam* presented a sum total of three witnesses, all family members, during the sentencing phase; didn't interview multiple other family members who would have testified to severe abuse; didn't call any mental health experts to the stand (and could give no cogent explanation for this decision); and didn't try to obtain any of Abdul-Salaam's school or juvenile records (which contained additional evidence of his troubled childhood). *Id.* at 258, 261.

Here, by contrast, counsel presented four expert witnesses—all of whom opined as to Terry's mental health and one of whom interviewed multiple family members and opined that neglect, rather than abuse, was the central problem in Terry's family. Counsel also put on extensive evidence of neglect in Terry's childhood. The robust mitigation case presented by Terry's lawyers is far removed from the performance criticized by our sister circuit in *Abdul-Salaam*. On this record, we decline to find that Terry's counsel were deficient.

36

## 3.

In any event, Terry suffered no prejudice from counsel's alleged deficiency. "The question of whether counsel's deficiency prejudiced the defense centers on whether there is a reasonable probability that, absent counsel's errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Sigmon*, 956 F.3d at 192 (cleaned up). A showing of prejudice "requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011). To establish *Strickland* prejudice, Terry must demonstrate "a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537. In determining whether Terry has shown prejudice, we review the "totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695.

Here, the jury heard substantial mitigating evidence—about both Terry's neglectful and somewhat violent childhood and his significant brain damage. Four experts testified (without rebuttal from the state) to the effects of brain damage on Terry's behavior, explaining in detail how Terry's brain dysfunction limited his ability to control his behavior and how the various aggravating circumstances raised by the state were consistent with Terry's mental impairment. Nevertheless, the jury took a little over an hour to recommend that Terry be sentenced to death.

The reason, in our view, is because the aggravating circumstances of Terry's crimes, and his propensity for violence, were too much to overcome. Before breaking into Jackson's house and murdering her, Terry disconnected Jackson's telephone so that she couldn't call for help. He brutally beat Jackson, likely striking her with two weapons and

37

hitting her head multiple times with a blunt object hard enough to crush her skull.[13] *See* J.A. 372 (where Dr. Carter opined that Terry used two weapons during his assault on Jackson); *State v. Terry*, 529 S.E.2d at 276 (stating that Jackson's "cause of death was blunt trauma with skull fracture and brain injury"). Terry also raped Jackson. This senseless murder was the culmination of a life littered with crimes and a pattern of violence, particularly toward women. In the face of the state's case in aggravation, we agree with the district court that there's no reasonable probability that Terry's additional evidence of childhood abuse would have led even one juror to conclude that "the balance of aggravating and mitigating circumstances did not warrant death." *Sigmon*, 956 F.3d at 192.

The affidavits from Vogelsang and Schwartz-Watts concerning the effect of Terry's childhood abuse on their analyses confirms our conclusion. Vogelsang doesn't explain how the additional evidence of abuse would have changed her opinion, other than saying that the evidence "could have shed light on why Gary is the way he is." J.A. 79. Dr. Schwartz-Watts explains that, had she known that Terry suffered childhood abuse, she would have opined that the abuse was "mitigating in its own right" and "is also significant with respect to significant brain dysfunction, as the abuse may have actually contributed to the dysfunction." J.A. 102. Schwartz-Watts also states, "Terry had more neurological dysfunction than any patient I have ever evaluated, including those prior to 1997 and

---

[13] The record doesn't specify the type of weapon, or weapons, Terry used to beat and ultimately murder Jackson.

since." *Id.* But she doesn't connect this observation to Terry's childhood abuse.[14] And as we have already explained, the evidence of abuse, though potentially mitigating in its own right, doesn't overcome the mountain of aggravating evidence found in the record and is not prejudicial in light of the robust, and unrebutted, mitigation case Terry's trial counsel did present. *See, e.g.*, *McHone v. Polk*, 392 F.3d 691, 710 (4th Cir. 2004) (no prejudice from counsel's failure to present evidence that as a child petitioner had witnessed his father "regularly inflict brutal beatings" on his mother and half-sister when counsel had presented evidence that petitioner's father had engaged in "violent fights" with his mother).

In sum, we're not persuaded that Terry's new mitigation theory would have fared any better than the case that was actually presented. Thus, even if counsel's performance was deficient, it wasn't prejudicial under *Strickland* and thus doesn't excuse procedural default under *Martinez*.

## B.

Terry next argues that counsel were deficient in jury selection for failing to ferret out jurors Brown and Ritchie who, Terry argues, were unqualified under *Morgan*. Once again, we disagree.

"On habeas review, federal courts generally accord particular deference to the judgment of trial counsel during *voir dire*." *Gardner v. Ozmint*, 511 F.3d 420, 426 (4th

---

[14] Terry used Dr. Schwartz-Watts's opinion regarding neurological dysfunction to support his argument to the district court that his counsel were deficient for failing to present a guilty but mentally ill defense. But he has abandoned that argument on appeal.

39

Cir. 2007) (cleaned up). Under *Morgan*, "[a] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." 504 U.S. at 729. And "part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." *Id.* Nonetheless, "[t]he Constitution . . . does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury." *Id.*

Terry fails to overcome the presumption that trial counsel rendered effective assistance in jury selection. *See Strickland*, 466 U.S. at 689. Counsel asked jurors Brown and Ritchie whether they could impose either a life or death sentence, even after convicting a defendant of murder and other crimes. Both said they could.

Fifteen years later, after having heard all the evidence, and at variance with his answers during jury selection, Brown states that he "believe[s] the death penalty is the right punishment for murder if there are also other crimes." J.A. 49. Ritchie is less categorical, saying that "the evidence regarding [Terry's] brain injury did not impact me." J.A. 51. These affidavits are of limited value to Terry, however, because "consideration of statements made by trial jurors after they experienced the entire trial and sentencing hearing and after deliberating on the verdicts are not reasonably probative of [the honesty of their answers to voir dire questions as to] whether [they] could consider the evidence with open minds and follow the court's instructions on the law." *Neill v. Gibson*, 278 F.3d 1044, 1056 (10th Cir. 2001) (cleaned up).

And even if Brown and Ritchie weren't qualified under *Morgan*, Terry doesn't explain how counsel's questions constituted deficient performance. Indeed, Terry doesn't

40

suggest questions that trial counsel failed to ask to determine whether the jurors would have considered mitigating evidence after finding Terry guilty of murder, rape, and burglary. Nor does he explain what else counsel could have done to push back against the trial court's limitations on the scope of their questions to prospective jurors.

The district court correctly rejected this claim.

C.

Finally, the district court didn't abuse its discretion by denying Terry an evidentiary hearing on his *Strickland* claims. To grant an evidentiary hearing, "there must be a viable constitutional claim, not a meritless one, and not simply a search for evidence that is supplemental to evidence already presented." *Segundo v. Davis*, 831 F.3d 345, 351 (5th Cir. 2016) (cleaned up).

Here, Terry has failed to present a viable constitutional claim of ineffective assistance of counsel, and the evidence of childhood abuse he now wishes us to consider is either supplemental to the evidence counsel presented at sentencing or was unavailable to trial counsel due to the errors of experts, for which counsel aren't responsible. We therefore decline to order an evidentiary hearing.

\*     \*     \*

For the reasons given, the judgment of the district court is

*AFFIRMED.*

41